**Not for Publication**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

AMA REALTY LLC,

    *Plaintiff,*

    v.

9440 FAIRVIEW AVENUE LLC, et al,

    *Defendants.*

Civil Action No. 13-457 (JMV) (MF)

**OPINON**

**John Michael Vazquez, U.S.D.J.**

    This case comes before the Court on four separate motions for summary judgment: two by all Defendants except for Tilcon New York Inc. ("Tilcon")[1]; one by Joseph M. Sanzari Inc., Timothy Murray, North Bergen Asphalt LLC, and Joseph M. Sanzari (the "Sanzari Defendants"); and one by Plaintiff AMA Realty LLC ("AMA"). The underlying dispute is over alleged illegal dumping of hazardous materials in violation of both a lease and the relevant government regulations. Plaintiff alleges that Defendants' activities caused substantial damages to Plaintiff's property that will need costly remediation and may result in liability from government regulators. For the reasons set forth below, Defendants' motion as to Counts One and Two is **GRANTED**; the Sanzari Defendants' motion as to Count Three is **GRANTED**; Defendants' motion as to Counts Four, Five, Seven and Nine is **GRANTED** in part and **DENIED** in part; and Plaintiff's motion is **DENIED**.

---

[1] Tilcon has also filed a motion for summary judgment, D.E. 183, that will be addressed in a separate Opinion. Third-party Defendant Perfect Body & Fenders Co., Inc. has also filed a motion for summary. D.E. 178. As with Tilcon's motion, it will be addressed in a separate Opinion.

## I. Factual Background

The relevant facts are taken from the First Amended Complaint ("FAC"), the parties' respective statements of material fact,[2] and the documents annexed to their submissions. Plaintiff owns a parcel of land and a commercial structure located at 9501 Fairview Avenue in North Bergen, New Jersey (the "Property"), which is subject to a lease signed by Michael Aita for AMA and Joseph M. Sanzari. *See* Ex. 1 to the Certification of Bruce L. Goldstein, Esq. in Support of Plaintiff's Motion for Partial Summary Judgment (hereinafter "Goldstein Cert."). Aita is the president of AMA. FAC, D.E. 31 at ¶1. The parties agree that AMA is a party to the lease but dispute who is the other party. The lease term ran from July 1, 2007 to June 30, 2017. *Id.* at ¶¶1-2. The lease also contained an option to purchase after 10 years. Defendants' SOMF Count II at ¶6; FAC at ¶1, 26, 28. Plaintiff alleges that the lease was signed with the understanding that the property would be used for "construction equipment storage." FAC at ¶30.

As noted, the parties dispute whether the lease is truly between AMA and Defendant 9440 Fairview Avenue LLC ("Fairview") or between AMA and Sanzari personally. *See* Defendants' SOMF Counts I and II at ¶2, Plaintiff's SOMF Counts I and II at ¶2. When Sanzari signed the lease, Fairview had not yet been formed but it was created before the effective date on the lease. *See* Ex. EE to the Certification of Timothy Corriston, D.E. 181-5 (hereinafter

---

[2] The relevant statements of material facts are referred to as follows: Defendants' Statement of Undisputed Facts as to Counts I and II, D.E. 180-1, hereinafter "Defendants' SOMF Courts I and II"; Plaintiff's Response to Defendants' Statement of Undisputed Material Facts as to Counts I and II, D.E. 202, hereinafter "Plaintiff's SOMF Counts I and II"; Sanzari Defendants' Statement of Undisputed Material Fact as to Count III, D.E. 181-2, hereinafter "Defendants' SOMF Count III"; and Plaintiff's Response to Sanzari Defendants' Undisputed Material Fact as to Count III, hereinafter "Plaintiff's SOMF Count III."

"Corriston Cert."); Ex. 1 to Goldstein Cert. Sanzari was president and majority stockholder in Fairview. Sanzari Defendants' SOMF Count III at ¶21. The title of the lease reads "Agreement of Lease between AMA Realty, a New Jersey Partnership . . . and Joseph M. Sanzari, Tenant," while the first paragraph names AMA Realty and 9440 Fairview Avenue Properties as the parties to the lease. *See* Ex. 1 to Goldstein Cert.

Before August 2011, Defendant North Bergen Recycling LLC ("NBR"), which recycled asphalt and concrete, was located on a parcel adjacent to the AMA-owned land. Defendants' SOMF Counts I and II at ¶8. Trucks delivered asphalt and concrete to NBR, who would then process the material and ship it to a recycling plant. Defendants' SOMF Counts I and II at ¶34. Defendant Timothy Murphy managed and directed NBR, although Plaintiff contends that Sanzari was a principal of NBR. Plaintiff's SOMF Counts I and II at ¶8. Murphy is Sanzari's son-in-law. FAC at ¶32.

In order to recycle the asphalt and concrete, NBR applied for a Class B permit from the New Jersey Department of Environmental Protection ("NJDEP") in 1991. FAC at ¶33. NBR was granted the permit in 1993, and it was renewed in 1999, 2004, and 2009. *Id.* at ¶¶35-36. Defendants claim that NBR received the permit in 1991. Defendants' SOMF Counts I and II at ¶35 (stating that a temporary permit was granted in 1991 and a final permit was issued in 1994). Plaintiffs alleges that the NJDEP initially "withheld" the permit in 1991 because NBR failed to disclose "the amount of residual waste expected from the recycling process." FAC at ¶34.

As referenced, this case centers on the allegedly illegal dumping of hazardous materials, and related actions by certain Defendants, on the Property. Plaintiff claims that during the lease term, NBR wrongfully deposited the byproducts of their recycling operations on the Property. Plaintiff's SOMF Counts I and II at ¶17, FAC at ¶5-7. Plaintiff further alleges that NBR

"engaged in filling in protected wetlands in an unauthorized expansion" of the Property, and "dumped contaminated and/or hazardous materials directly into" adjacent creeks. FAC at ¶¶6-7. Plaintiff adds that Defendants expanded their operations on the Property without NJDEP approval and concealed residual waste from NJDEP. *Id.* at ¶¶5, 6, 41, 44. By dumping residual waste, recycled asphalt millings, and concrete aggregate on the Property, Plaintiff alleges Defendants changed the grade of the Property, forming a "slope now directed toward the building," which in turn causes flooding. FAC at ¶11. Plaintiff states that before the dumping, the grade of the property ran away from the building on the Property. *Id.* at ¶51. Due to the change in the grade, Plaintiff asserts that the building now floods and that certain Defendants also improperly installed storm drains. *Id.* As a result of the foregoing actions, Plaintiff alleges that Defendants violated the terms of the lease and engaged in a scheme to defraud both Plaintiff and the NJDEP.

Defendants vacated the Property on December 15, 2011, several years before the June 30, 2017 termination date. FAC at ¶12. In August 2011, NBR sold its recycling business to Defendant Tilcon, which continues to operate on the adjoining land. FAC at ¶40. Plaintiff alleges that Tilcon "permitted and continues to permit contaminated groundwater to flow" onto the Property. *Id.* at ¶14.

Other facts pertinent to the specific claims are discussed in more detail below.

## II.    Procedural History

Plaintiff filed its initial Complaint on January 23, 2013. D.E. 1. It filed the FAC on September 9, 2013. D.E. 31. The FAC sets forth the following counts against all Defendants except Tilcon: Count One - violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Count Two – RICO conspiracy, Count Three - breach of contract, Count Four -

4

negligence, Count Five - unjust enrichment, Count Six - violations of the Clean Water Act

("CWA"), Count Seven - fraud, and Count Nine - punitive damages. *Id.* Count Eight is a claim

for private nuisance against Tilcon. Defendants filed a motion to dismiss the FAC on September

18, 2013. D.E. 33. Tilcon filed a motion to dismiss shortly thereafter. D.E. 38. Judge McNulty

denied both motions, finding that Plaintiff had set forth plausible allegations, on May 2, 2014.

D.E. 52, 53.[3]

On May 30, 2014, Plaintiff filed a motion for a permanent injunction to enjoin

Defendants from entering Plaintiff's property, which was denied by Judge McNulty on August

14, 2014. D.E. 56, 78. In their amended Answer, Defendants filed a third-party complaint

against Perfect Body & Fenders Co., Inc. ("PBF") for contribution and indemnification, and

counterclaims against Plaintiff for breach of contract, breach of the duty of good faith and fair

dealing, and unjust enrichment. D.E. 64.[4] PBF had entered into a sublease with Fairview for a

---

[3] Plaintiff repeatedly argues that Judge McNulty's decision denying the Defendants' motion to dismiss is the "law of the case" and thus Defendants' motions for summary judgment on the two RICO claims must fail. However, Judge McNulty did not decide on a rule of law that Defendants now contest. Instead, he merely found that Plaintiff had stated plausible allegations precluding the motion to dismiss.

Plaintiff fails to cite precedent to support its far-reaching view of the law of the case doctrine; nor could the Court find any. Moreover, Plaintiffs argument appears to mean that if a party survives a motion to dismiss, it will automatically defeat summary judgment. The Court is aware of no authority to support this proposition. Indeed, the two motions carry with them very different standards of review. The Third Circuit has observed as follows: "It is axiomatic that the standards for dismissing claims under Fed. R. Civ. P 12(b)(6) and granting judgment under either [Rule 50] or [Rule 56] are vastly different[.]" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (citations omitted). A motion to dismiss for failure to state a claim focuses on the sufficiency of a plaintiff's *allegations*. A motion for summary judgment, by comparison, reviews whether a party has sufficient *evidence* to support its claims. Although it appears obvious, the Court notes that allegations are not the same as actual evidence. This difference is addressed further in note 6 *infra*. The Court does not accept Plaintiff's law of the case argument.

[4] The Sanzari Defendants' third party complaint also named Millennium Resource Recovery, Ltd., who have since been terminated. D.E. 175.

portion of the building on the Property.

Defendants filed the instant motions on December 23, 2016. D.E. 180, 181,[5] 182. Plaintiff filed its opposition on February 3, 2017, D.E. 189, 190, 194, and Defendants replied on April 13 and 17, 2017. D.E. 211, 213, 214. Plaintiff also filed a motion for summary judgment as to the issue of Sanzari's personal liability on the lease on December 23, 2016. D.E. 184. Defendants opposed Plaintiff's motion, D.E. 187, to which Plaintiff replied on February 17, 2017. D.E. 199.

### III. Legal Standard

#### a. Summary Judgment

Summary judgment is proper where the moving party "shows that there is no genuine dispute as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir. 1999). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial."

---

[5] Fairview did not join this motion for summary judgment.

*Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.[6]

---

[6] Plaintiff fundamentally miscomprehends how the FAC may be used at the summary judgment stage. Plaintiff contends that Defendants cannot use the FAC against Plaintiff, and that Plaintiff can use allegations made in the FAC to preclude summary judgment. Defendants can use unequivocal statements, which would otherwise require evidentiary proof, in the FAC as evidence against Plaintiff because such statements are considered judicial admissions by Plaintiff. *See Judon v. Travelers Prop. Cas. Co. of Am.*, 773 F.3d 495, 502 & n.6 (3d Cir. 2014). Plaintiff, by comparison, cannot rely on the mere allegations contained in its FAC as sufficient proof to create a genuine issue of material fact precluding summary judgment. Instead, Plaintiff must come forward with actual evidence at the summary judgment stage. *See* F.R.Civ.P. 56(c)(1) (indicating that a party asserting a genuine fact "must support" its position with listed materials from the record); *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (noting that while sufficiently pleaded allegations in a complaint are sufficient to overcome a motion to dismiss, actual evidence must be presented at the summary stage).

## IV. Analysis

### a. RICO Claims – Counts One and Two

RICO, 18 U.S.C. § 1961 *et seq.*, states that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Racketeering activity is defined in § 1961(1)(B) as "any act which is indictable under" a number of listed federal laws, including mail fraud; these federal offenses are called "predicate acts." *See* 18 U.S.C. § 1341; 18 U.S.C. § 1962(1)(B). To claim a violation of § 1962(c), a plaintiff must show "(1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity." *Sedima, S.P.L.R. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). A "pattern" of racketeering activities requires two acts of racketeering within a ten-year period. 18 U.S.C. § 1961(5). To prove civil liability under RICO, a plaintiff must prove injury to "his business or property." 18 U.S.C. §1965(c).

Plaintiff here alleges the predicate act of mail fraud, 18 U.S.C. § 1341. The mail and wire fraud statutes "prohibit the use of the mail or interstate wires for purposes of carrying out any scheme or artifice to defraud." *Kolar v. Preferred Real Estate Investments, Inc.*, 361 Fed.Appx. 354, 362 (3d Cir. 2010). The scheme "need not be fraudulent on its face, but [it] must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.* (citations omitted). "Just as the mailings are an element of the federal offense of mail fraud, so too is the scheme or artifice to defraud." *Tabas v. Tabas*, 47 F.3d 1280, 1294 (3d Cir. 1995), *see also Gagliardi v. Ward*, 967 F.Supp. 67,

69 (N.D.N.Y. 1997) (dismissing RICO claim because plaintiffs failed "to allege any deceptive act . . . as required by the mail fraud statute").

The Third Circuit Model Jury Instructions define a "scheme to defraud" as "any plan, device, or course of action to deprive another of money or property . . . by means of false or fraudulent pretenses, representations or promises reasonably calculated to deceive persons of average prudence." Third Circuit Model Jury Instructions, Fraud Offenses – Mail, Wire, Bank, and Health Care (18 U.S.C. §§ 1341, 1343, 1344, 1347), pg. 2, *available at*: http://www.ca3.uscourts.gov/sites/ca3/files/2016%20Chap%206%20Fraud%20Offenses%20revi sions.pdf. Plaintiff only has to show that "one or more of the alleged material misrepresentations were made in furtherance of the alleged scheme to defraud." *Id.*

The mailings have to be made during the alleged scheme and in furtherance thereof. As the Third Circuit has explained: "mailings taking place after the object of the scheme has been accomplished, or before its accomplishment has begun are not sufficiently closely related to the scheme to support a mail fraud prosecution." *See U.S. v. Cross*, 128 F.3d 145, 150 (3d Cir. 1997) (quoting *United States v. Tarnopol*, 561 F.2d 466, 471-72 (3d Cir. 1977)). *See also Parr v. United States*, 363 U.S. 370 (1960).

Courts have cautioned against attempts to transform an ordinary breach of contract action into a RICO claim. *See Kolar*, 361 Fed.Appx. at 364 (ruling that a "[plaintiff] cannot successfully transmute [his claims] into RICO claims by simply appending the terms 'false' and 'fraudulent'"). "Defraud" usually involves some act of "deprivation of something by value by trick, deceit, chicane or overreaching." *Sunlight Elec. Contracting Co., Inc. v. Turchi*, 918 F.Supp.2d 392, 404 (3d Cir. 2013). In *Sunlight*, the Third Circuit dismissed the RICO claims because the "essence of [plaintiff's] allegation" was that defendant had not properly performed

under a contract, and given there was no showing of fraud or deceit, the claims were "in the heartland of contract law." *Id.* at 405-6.

Plaintiff alleges three categories of fraudulent mailings: (1) mailings by NBR to the NJDEP while applying for the Class B recycling permit; (2) mailings by NBR of annual reports required by NJDEP to maintain the permit; and (3) mailings of monthly rent checks required under the lease to AMA. The Court will address each group of mailings, but first finds that Plaintiff has not shown that there is a genuine issue of material fact to support its allegation of a scheme to defraud.[7] Plaintiff alleges illegal dumping, as well as related activity, on its Property. But the dumping was done open and notoriously. Plaintiff has pointed to no evidence indicating that the alleged dumping was concealed or that it was accomplished through fraud. To the contrary, AMA admits that when Aita made two personal inspections of the Property in 2011, he readily noticed the improper dumping (and corresponding change to the grade of the property) and communicated his concerns to certain Defendants. *See* Ex. D to the Certification of Timothy Corriston, D.E. 180-6 at 139-140, Defendants' SOMF Counts I and II at ¶¶23, 27. A scheme to illegally dump, however, is not transformed into a scheme to defraud unless the other attributes of fraud are present.

### 1. Initial Permit Mailings

Plaintiff claims that the first group of actionable mailings was made when NBR mailed their application to the NJDEP for the Class B recycling permit in 1991, fifteen years before the

---

[7] The Court further notes that Plaintiff also apparently fails to point to evidence that any Defendant, other than Murray, is culpable for the purported mail fraud scheme, despite having charged Fairview, NBR, Sanzari, Joseph M. Sanzari Inc., and Murray with RICO violations. FAC at ¶62. Because the Court dismisses both RICO counts for other reasons, it does not reach this issue, but notes that Plaintiff is obligated to show culpable participation of each alleged member in the RICO and RICO conspiracy claims. *See United States v. Irizarry*, 341 F.3d 273, 285 (3d Cir. 2003).

lease was signed, representing that there would be no residual waste from the recycling process they used. FAC at ¶35. Plaintiff also alleges that the NJDEP refused to grant the temporary permit because NBR had not initially provided this information. *Id.* at ¶34. Plaintiff's claims about the initial mailings fail as a matter of law because the mailings were made over fifteen years *before* the alleged scheme; the mailings were not made during the course of the alleged scheme much less in furtherance thereof. *See U.S. v. Cross*, 128 F.3d at 150.

### 2. Rent Mailings

Plaintiff alleges that Defendants, by way of the mails, paid the monthly rent to AMA in furtherance of the misuse of the property. *See* FAC at ¶50. Plaintiff fails to make any allegation of fraud in relation to the mailing of the rent checks, other than to say that paying the rent helped facilitate the wrongful use of the property. *See* Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, D.E. 189, (hereinafter "Opposition Brief") at 29 (stating simply that the checks represented "monthly rent payments . . . clearly facilitating the Defendants' illegal use of the AMA property"). As noted above, misuse of a property (here, impermissible dumping) is not equivalent to fraud. Moreover, the rent mailings also fail as a matter of law to constitute an actionable mailing under the mail fraud statute. Plaintiff fails to raise a genuine issue of material fact to demonstrate how the mailed rent checks were in furtherance of the alleged fraudulent scheme (assuming the existence of such a scheme). The Court further notes that if it were to recognize Plaintiff's theory, then the mailing of any rent check would convert a potential breach of contract claim into actionable mail fraud. Using Defendants' example, a tenant in an apartment that prohibits pets would be liable for mail fraud if she sent in her rent check without disclosing that she, in fact, had a cat. Plaintiff has provided no authority for this expansive reading of the mail fraud statute nor could the Court find any.

### 3. Annual DEP Mailings

The final group of mailings were allegedly fraudulent, according to Plaintiff,[8] because NBR did not disclose in its annual reporting forms the amount of residual waste on the premises to the NJDEP. FAC at ¶41. NBR's NJDEP permit specifies that residue "should not exceed 1% by volume of the daily amount accepted." Defendants' SOMF at ¶39. Plaintiff alleges that Defendants deliberately did not disclose the amount of residue in furtherance of their misuse of the Property

The mailing of the annual report did not constitute fraud because there was no actionable misrepresentation or omission. Plaintiff is correct that NBR's permit required it to report its annual residue to the NJDEP. *See* Ex. G to Corriston Cert at pg. 7 §2(a). Of course, because the requirement was part of the criterion for receipt and renewal of the permit, the *NJDEP* was aware of the requirement. The NJDEP's annual report during the relevant time period, however, did not have an area to disclose the amount of annual residue. *See* Ex. N. to Corriston Cert. NBR never affirmatively misrepresented its annual residue to the NJDEP, and Plaintiff has not produced any evidence demonstrating that NBR fraudulently omitted the information in its annual filings. *See* Ex. O to Corriston Cert. The NJDEP's annual form at the time simply did not ask for the information. *See* Ex. N to Corriston Cert. The NJDEP, moreover, did make regular inspections of NBR's premises, including of NBR's residue containers. Indeed, Murray testified that the NJDEP inspected the site "sometimes weekly, sometimes monthly, sometimes bimonthly." *See* Ex. K to Corriston Cert. at 23. Thus, the NJDEP knew that NBR was to report

---

[8] Plaintiff is correct that to set forth a viable scheme to defraud, it need not show that it directly relied on the misrepresentations. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 651-52 (2008) (holding that plaintiffs alleging violations of civil RICO need not show first-party reliance on the alleged fraudulent misrepresentations in the predicate mailings). Given that Plaintiff has failed to show fraud in the first instance, the Court does not reach this point.

its residue, and the NJDEP also knew that NBR's recycling processes created residue.[9]  Given

that there were no affirmative misrepresentations in the annual reports; given that Plaintiff has

not shown any fraud, trickery, or deceit by NBR in omitting the residue information; and given

that NJDEP was well aware of NBR's reporting requirements as well as of the residue from

NBR's business, Plaintiff has not raised a genuine issue of material fact demonstrating that the

annual report mailings were in themselves fraudulent (or in furtherance of a scheme to defraud).

In sum, all three categories of mailings cited by Plaintiff do not support a mail fraud

scheme.  As a result, Defendants are entitled to summary judgment as to alleged predicate acts.

Without predicate acts, the RICO allegation fails as a matter of law.

Because Plaintiff's RICO claim fails, so too must its derivative claim for conspiracy

under RICO.  *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993) (stating

"any claim under section 1962(d) based on conspiracy to violate other subsections of [the RICO

statute] necessarily must fail if the substantive claims are themselves deficient").

### b.  Plaintiff's Contract Claim against Joseph M. Sanzari – Count Three

Here, the parties have filed competing summary judgment motions on the issue of

whether or not the underlying lease for the Property was between AMA and Fairview, on the one

hand, or between AMA and Sanzari, on the other.  As will be discussed, this is somewhat of an

unusual argument from Plaintiff because in the FAC, Plaintiff alleges that the tenant was

Fairview.  It appears that at the eleventh hour, Plaintiff located some information in its former

attorney's files which AMA now believes shows Sanzari to be the tenant.  Plaintiff never moved

to amend the FAC to include this allegation.

---

[9] After the litigation began, Murray wrote to the NJDEP in 2013 to alert the agency that NBR
had failed to report the residue on the annual forms, and included a page disclosing their residue
from 2003-2011.  Ex. R. to Corriston Cert.  The NJDEP took no action in response.

The Sanzari Defendants seek to dismiss the breach of contract claims against them, leaving contract claims against only Fairview. Plaintiff instead moves for summary judgment only as to Sanzari's personal liability for their contract claim damages. Neither party contests that a contract was formed, rather the only question is who the parties to the lease are. Likewise, neither party contests that New Jersey law controls.

Three documents are most relevant to the determination of whether Sanzari is personally liable for the alleged breaches of contract: the original lease dated December 31, 2006, the stipulation dated June 27, 2007, and the FAC. *See* Ex. U to Corriston Cert, Ex. Z to Corriston Cert., FAC, D.E. 31. Defendants contend that the fact that Sanzari is listed as the tenant on the title page of the lease was an error, as evidenced by the fact that in the body of the document, the tenant is referred to as Fairview. The signature block for the Landlord reads: "AMA REALTY CO., Landlord." *See* Ex. U to Corriston Cert. No Tenant is listed on the signature page, although Sanzari signed it after the word, "By:." On Rider I to the lease, Murray's signature appears on behalf of North Bergen Recycling Inc., as guarantor of a personal guarantee under the lease. *Id.*

As of the date of the lease, Fairview had not yet been formed. Although the lease was signed in December 2006, it was to commence on July 1, 2007. By the start date, Fairview had been formed.

Shortly after Sanzari signed the lease, Fairview's lawyer, Joseph Torre, mailed corrected signature pages for the original lease to AMA's lawyer, Jordan Yuelys, on January 23, 2007 stating as follows: "Note the Lease is between 9440 Fairview Avenue Properties LLC and AMA, not Joseph M. Sanzari." *See* Ex. R to Corriston Cert. The corrected signature page fills in the blank before "Tenant" with "9440 Fairview Avenue Properties LLC." *Id.* Yuelys never

responded to indicate the he either agreed or disagreed with the correction. Additionally, a draft of the lease reflected that Fairview was to be the tenant. *See* Ex. J to Corriston Cert (showing a December 22, 2006 draft of the lease in which Torre identified AMA and 9440 Fairview Avenue Properties LLC as the parties to the agreement); Ex. AA to Corriston Cert. at 90, 101.

The June 27, 2007 stipulation allowed Fairview to sub-lease the property to PBF, now a third-party defendant. *See* Ex. Z to Corriston Cert. The stipulation states that in the case of "any conflict between the terms of the Option Agreement and/or the Lease Agreement and this Stipulation, the terms of this Stipulation shall control." *Id.* The signature block for the "tenant" reads "9440 Fairview Avenue, LLC." Aita signed on behalf of AMA, and Sanzari signed on behalf of Fairview. *Id.*

On June 28, 2007, Fairview was formed as a limited liability company under the New Jersey Limited Liability Company Act. *See* Ex. EE to Corriston Cert. On June 29, 2007, Torre wrote a memo to Yuleys stating that the initial lease:

> [P]rovided that Joseph M. Sanzari, initially named as tenant, had the right to assign the lease to an entity owned or controlled by him and thereupon be released from personal obligations. This confirms that the "tenant" in our lease of December 31, 2007 is 9440 Fairview Avenue LLC."

> Ex. BB to Corriston Cert.

Torre stated that this fax was sent in error as Sanzari was not the tenant under the lease. *See* Ex. B to Corriston Cert. at 39.

As noted, the FAC makes no mention of the theory Plaintiff now proffers. To the contrary, the FAC refers to Fairview as the tenant under the lease. Plaintiff filed the FAC on September 9, 2013, and has made no attempt to amend it since then. Instead, AMA advances a wholly new theory of liability (that Sanazari is the actual tenant as opposed to Fairview) in its motion for summary judgment, and claims that Defendants cannot use the allegations made in

15

the FAC against it. Plaintiff's contention that Fairview was the tenant was not limited to the FAC. In Plaintiff's RICO Case Order, AMA describes "Corporate Defendant 9440 Fairview Avenue LLC" as having "entered into a 10 year commercial lease agreement with the Plaintiff, AMA Realty." Ex. B to Corriston Cert. In addition, at the motion to dismiss stage, Judge McNulty described the lease as being between AMA and Fairview, because Plaintiff itself argued that was correct. *See* D.E. 52 ("Plaintiff and Defendant 9440 Fairview Avenue LLC ('9440 LLC') entered into a 10-year lease"), D.E. 43 (wherein Plaintiff states in its "Statement of Facts" that "AMA and Fairview" entered into the lease).

The "basic rule of contractual interpretation [is] that a court must discern and implement the common intention of the parties." *Pacifico v. Pacifico*, 190 N.J. 258, 77 (2007). Mere prefatory language, where it conflicts with the body of the contract, does not control the agreement's terms, and any such conflict must be construed in favor of the operative provisions of the agreement. *Gulf Oil Corp. v. F.P.C.*, 563 F.2d 588, 598 (3d Cir. 1977). Here, the body of the lease referred to Fairview, which favors a finding that it was the tenant.[10]

New Jersey courts have also looked to see if a person signs twice to indicate both entity and personal liability. *See Home Buyers Warranty v. Roblyn Development Corp.*, 2006 WL 2190742, at *4-5 (App. Div. 2006). In addition, "the conduct of the parties after execution of the contract is entitled to great weight in determining its meaning." *Joseph Hilton & Associates, Inc.*

---

[10] Plaintiff also notes that different iterations of Fairview were recited in the lease. *See* Ex. 1 to Goldstein Cert. (referring to Fairview as 9440 Fairview Avenue Properties LLC and 9440 Fairview Avenue LLC). Yet, the same is true of AMA. *See id.* (referring to AMA as AMA Realty; AMA Realty Co.; and AMA Realty Co., a New Jersey Partnership). Thus, following Plaintiff's logic, *it* would not be the proper party to this action. The Court does not find this argument persuasive.

*v. Evans*, 201 N.J. Super. 156, 171 (App. Div. 1985).[11] Throughout the course of the lease, the parties treated Fairview as the tenant. For example, the stipulation referred to Fairview not Sanzari personally. The rent checks that AMA accepted were in the name of Fairview. Also, AMA's attorney, Yuelys, never objected to Torre's clarification soon after the least was signed. Although Yuelys did not affirmatively accept it either, the clarification is the type of information to which a reasonable attorney would normally respond if he disagreed.

Putting aside the course of conduct of the parties during the lease, Plaintiff has at least three times in this litigation asserted that the tenant was Fairview: In the FAC, in the RICO Case Order, and in its motion to dismiss. The assertions made in the three documents are judicial admissions that are binding on Plaintiff. *See Judon v. Travelers Property Cas. Co. of America*, 773 F.3d 495, 502 n.6 (3d Cir. 2014), *see also Berckeley Inv. Grp., Ltd. V. Colkitt*, 455 F.3d 195, 211 & n.20 (3d Cir. 2006) (defining judicial admissions as "concessions in pleadings or briefs that bind the party who makes them"). The contentions were unequivocal and would otherwise be subject to evidentiary proof. *Judon*, 773 F.3d at 502 n.6.

Additionally, AMA's claim that Sanzari should be personally liable is barred by the doctrine of corporation by estoppel. Corporation by estoppel prohibits a party from denying the existence of a corporation after it has entered into a contract with that entity "as a corporation." *See Pharmaceutical Sales and Consulting Corp. v. J.W.S. Delavau Co., Inc.*, 59 F.Supp.2d 398, 405 (D.N.J. 1999). In *Pharmaceutical Sales*, Judge Cooper found that theory applied even

---

[11] Plaintiff objects to the consideration of certain evidence as barred by the parol evidence rule. The parol evidence rule bars consideration of "any previous oral representations or agreements" that purport to "vary, modify, or supercede the written contract." *Genesis Bio Pharmaceuticals, Inc. v. Chiron Corp.*, 27 Fed. Appx. 94, 99 (3d Cir. 2002) (applying New Jersey law) (internal citations omitted). The parol evidence rule applies to oral and written agreements made *before* the agreement is signed, not after. Since the relevant evidence concerns activity after the signing of the lease, the parol evidence rule in inapplicable.

though the party realized *when preparing for trial* that the putative corporation had never in fact been incorporated. Here, by comparison, Fairview was formed before the effective date of the lease. It is clear that AMA believed it was dealing with a limited liability corporation at the time the lease was signed and throughout the relevant period given the body of the lease, that Plaintiff never objected to the change Torre requested in the lease documents, the stipulation, the rent payments, and AMA's own unequivocal assertions throughout the litigation until the current motion.

Plaintiff's counter-arguments on this point are unconvincing. First, AMA claims that it would be inequitable to allow Fairview to use corporation by estoppel to their advantage, as they have been accused of fraud. However, the Court has found that Plaintiff has failed to adequately support its theory of fraud (as discussed above), and the Court finds instead it would be inequitable to allow Plaintiff to proceed given its complete reversal of position over the course of this litigation. Plaintiff attempts to use dicta in *Pharmaceutical Sales* to support its argument, in particular, a distinction between the facts of that case and those in which individuals have "wrongfully held themselves out as the agents of a nonexistent corporation[.]" *See Pharmaceutical Sales*, 59 F.Supp.2d at 405-06. Plaintiff, without explanation, refers to Fairview as a "nonexistent corporation," despite the fact that Fairview was incorporated before the effective date of the lease.

Finally, the genesis of Plaintiff's late change of course concerning Sanzari as the tenant appears to be the result of Plaintiff's discovery of documents at Yuelys' office in May 2016. Of course, Plaintiff located this information over three years *after* it filed its initial Complaint. Plaintiff makes an unconvincing argument that it acted in good faith when it asserted in the FAC that Fairview was the tenant because it was unaware of Yuelys' information. The good faith

argument is easily dismissed. The documents were in the possession of *Plaintiff's* agent, its real estate counsel, so Plaintiff is at a minimum charged with constructive knowledge of such information. Moreover, any reasonable inquiry *before* filing suit should have included a thorough review of AMA's real estate attorney's file related to the lease.[12] Thus, the Sanzari Defendants' motion as to Count III is granted, and Plaintiff's motion for summary judgment is denied.

### c. Remaining Common Law Claims

Defendants have moved for summary judgment on four of Plaintiff's remaining common law claims: negligence, unjust enrichment, fraud, and punitive damages.

### i. Negligence – Count Four

Plaintiff would be unable to recover for negligence absent an independent duty owed outside the contractual relationship between AMA and Fairview. *See Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297, 309 (2002). In their FAC, Plaintiff fails to plead an independent duty owed to AMA by Fairview; rather they cite only to violations of the underlying lease. *See* FAC at ¶91 (stating that "Defendants had an affirmative duty to adhere to the terms and conditions" of the "written lease agreement"). Thus, while there is conceivably an independent duty on which to base negligence, Plaintiff did not assert one in the FAC. *Id.* at ¶¶91-94. Thus, the Court grants Defendant's motion and Count Four is dismissed.

### ii. Unjust Enrichment – Count Five

"To state a claim for unjust enrichment, a plaintiff must allege "'(1) that the defendant

---

[12] Plaintiff also makes much of Sanzari's "wet ink" signature on the lease and further makes arguments concerning the best evidence rule. Plaintiff's arguments, however, are misplaced. While Defendants contests the validity of the lease signed in December 2006, they accepted it as true for purposes of the current motion.

has received a benefit from the plaintiff, and (2) that the retention of the benefit by the defendant is inequitable.'" *Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509, 519 (D.N.J. 2009), *aff'd*, 374 F. App'x 341 (3d Cir. 2010). Plaintiff alleges that by improperly dumping hazardous material on the Property, Defendants were unjustly enriched; they reaped the benefits of disposing of the materials without paying for it and left the property essentially unusable. While the Court finds that this allegation may give rise to unjust enrichment, Plaintiff may only recover under this theory or under its breach of contract theory, not both. *See Addie v. Kjaer*, 737 F.3d 854, 860 (3d Cir. 2013) (stating it is "well settled that unjust enrichment damages are unavailable when a claim rests on a breach of an express contract"). Thus, the Defendants' motion as to Count Five is denied. However, Plaintiff will not be permitted a double recovery pursuant to breach of contract and unjust enrichment. If necessary, the Court can craft any judgment to ensure that there is no double recovery by Plaintiff.

### iii. Fraud – Count Seven

The elements of common law fraud are: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997) (citations omitted). As was the case with Plaintiff's claims under the mail fraud statute underlying their RICO claims, Plaintiff has failed to show evidence of the key element: an act of deceit or purposeful misrepresentation. Plaintiff is now attempting to argue fraud in the inducement of the lease, but it made no such allegation in the FAC. Plaintiff cannot in effect amend the FAC by making new factual arguments in a subsequently-filed brief. *See Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (stating that "it is axiomatic that [a] complaint may not be

amended by the briefs," in that case a brief in opposition to a motion to dismiss). Thus, Defendants' motion for summary judgment on the common-law fraud count is granted.

### iv. Punitive Damages – Count Nine

Punitive damages are awarded under New Jersey's Punitive Damages Act when a plaintiff can prove, by clear and convincing evidence, that their harm was caused by the defendant and that the defendant has acted with "actual malice," or a "wanton and willful disregard of persons who foreseeably might be harmed" by their "acts or omissions." *See* N.J.S.A. 2A:15-5.12. Generally, an award of punitive damages requires a finding of a high degree of culpability. *See Sandler v. Lawn-A-Mat Chemical & Equipment Corp.*, 141 N.J. Super. 437, 498-99 (App. Div. 1976) (stating that "actual malice" is "nothing more or less than intentional wrongdoing [,] an evil-minded act") (citations omitted). As discussed above, Plaintiff here has failed to allege any tortious or fraudulent conduct on behalf of Defendants. *See id.* at 498 (stating "[m]ere negligence is not sufficient"); *Boyes v. Greenwich Boat Works, Inc.*, 27 F.Supp. 2d 543, 548-49 (D.N.J. 1998) (stating that "fraud, standing alone" is not enough to justify an award of punitive damages). Given that neither a tort nor fraud alone could justify an award of punitive damages, the Court cannot sustain this count given that it has dismissed Counts One and Two, for failure as to the alleged mail fraud; Count Four, for failure to properly assert a duty giving rise to a tort claim for negligence; and Count Seven, for again failing to present sufficient evidence of fraud. Thus, Defendants' motion as to Count Nine is granted.

### V. Conclusion

For the reasons stated above, and for good cause shown, Defendants' motion as to Counts One and Two is **GRANTED**; the Sanzari Defendants' motion as to Count Three is **GRANTED**, Defendants' motion as to Counts Four, Five, Seven, and Nine is **GRANTED** in part and

**DENIED** in part; and Plaintiff's motion as to Count Three is **DENIED.** An appropriate Order accompanies this Opinion.

Dated: December 28, 2017.

John Michael Vazquez, U.S.D.J.