# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMA REALTY LLC, | CIVIL ACTION NO.: 02:13-cv-00457 (JMV/MF) |
| Plaintiff/Counterclaim Defendant, | |
| v. | |
| 9440 FAIRVIEW AVENUE, LLC, JOSEPH SANZARI, TIMOTHY MURRAY, JOSEPH SANZARI INC., NORTH BERGEN ASPHALT LLC, and TILCON NEW YORK, INC. | |
| Defendant/Counterclaimant/ Third-Party Plaintiff | |
| v. | |
| MILLENNIUM RESOURCES RECOVERY, LTD, PERFECT BODY & FENDERS CO., INC., and JOHN DOES 1-5. | |
| Third-Party Defendants. | |

## DEFENDANT/THIRD PARTY PLAINTIFF 9440 FAIRVIEW AVENUE, LLC AND DEFENDANTS JOSEPH SANZARI, TIMOTHY MURRAY, JOSEPH SANZARI INC. AND NORTH BERGEN ASPHALT, LLC'S

## BRIEF IN SUPPORT OF MOTION *IN LIMINE* TO PRECLUDE THE OPINIONS OF ANTHONY J. RINALDI

Connell Foley LLP
56 Livingston Avenue
Roseland, NJ 07068
973.535.0500
*Attorneys for Defendant/*
*Counterclaimant/Third-Party Plaintiff,*
*9440 Fairview Avenue, LLC, and*
*Defendants, Timothy Murray, individually,*
*Joseph M. Sanzari Inc., and North Bergen*
*Asphalt, LLC,*

Krovatin Klingeman LLC
60 Park Place, Suite 1100
Newark, NJ 07102
973.424.9777
*Attorneys for Defendant,*
*Joseph M. Sanzari, individually*

*Of Counsel and On the Brief*:
  *Timothy E. Corriston, Esq.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS ................................................................................. 2

LEGAL ARGUMENT ...................................................................................... 4

POINT I ......................................................................................................... 5

THE OPINIONS SHOULD BE BARRED BECAUSE THEY
ARE UNRELIABLE AND NOT BASED UPON SUFFICIENT
FACTS OR METHODOLOGY.                                                      5

POINT II ........................................................................................................ 7

RINALDI'S OPINIONS SHOULD BE BARRED BECAUSE
THEY ARE UNRELIABLE AND NOT BASED UPON
SUFFICIENT FACTS                                                             7

    A.      Rinaldi's stigma opinion is not based upon a reliable
methodology. ...................................................................................8

    B.      Rinaldi's opinions do not fit and are irrelevant. ...........................11

        1.    Rinaldi's conclusion that Plaintiff AMA is entitled to stigma
damages has no factual basis. ......................................................14

        2.    Rinaldi's conclusion that Plaintiff AMA is entitled to
deferred utility damages has no factual basis. ...............................17

        3.    Rinaldi's cost to cure measurement is not based upon a
reliable methodology. ...................................................................20

        4.    Rinaldi's excess operating expense submission does not fit
and is irrelevant. ..........................................................................22

        5.    Rinaldi's opinions do not assist the trier of fact and are
irrelevant. .....................................................................................22

CONCLUSION ............................................................................................. 24

# TABLE OF AUTHORITIES

## *Cases*

*Calhoun v. Yamaha Motor Corp.*, USA, 350 F.3d 316, 321 (3d
Cir. 2003) .................................................................................................. 7

*Collier v. Varco-Pruden Bldgs., a Div. of United Dominion
Industries, Inc.*, 911 F.Supp. 189 (D.S.C. 1995) ................................15

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1435 (2013) ...................... 9

*Curtis v. Besam Group*, 2008 WL 1732956 (D.N.J.) ............................15

*Dade v. Diguglielmo*, 283 Fed.Appx. 979, 982 (3d Cir. 2008) .............15

*Dart v. Kitchens Brothers Manufacturing Co.*, 2007 WL
3283750 (5th Cir. 2007) ........................................................................ 9

*Daubert*, 509 U.S. at 593 n.10.....................................................7, 8, 9, 14

*Elcock v. Kmart Corp.*, 233 F.3d 734, 756 n. 13 (3d Cir. 2000) ............14

*G-I Holdings v. Hartford Fire Ins. Co.*, 2007 WL 842009
(D.N.J.) ..................................................................................................17

*Guillory v. Domtar Industries Inc.*, 95 F.3d 1320, 1329-31 (5th
Cir. 1996) ...............................................................................................16

*Hebbler v. Turner*, 2004 WL 414821, *4 (E.D.La.) .............................. 9

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) .................... 8

*Marcus v. BMW of N. Am.*, 687 F.3d 583 (3d Cir. 2012)........................ 8

*Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000)................... 7

*Ortho-McNeil Pharmaceutical, Inc. v. Kali Laboratories, Inc.*,
482 F.Supp.2d 478, 510 (D.N.J. 2007) ................................................16

*Paoli R.R. Yard PCB Litig.* 35 F.3d 717, 742 (3d Cir. 1994)................. 8

*Reeves v. Commonwealth Edison Co.*, 2008 WL 239030, *8
(N.D. Ill.)...............................................................................................15

## TABLE OF AUTHORITIES

*Rogers v. Ford Motor Co.*, 952 F.Supp. 606 (N.D.Ind. 1997) ...............................15

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396,
    404 (3d Cir. 2003) .............................................................................. 7

*Smith v. Freightliner, LLC*, 239 F.R.D. 390, 392 (D.N.J. 2006) ............................ 9

*Teska v. Potlach Corp.*, 184 F.Supp.2d 913 (D.Minn. 2002)...............................15

*TMI Litigation*, 193 F.3d 613, 670 (3d Cir. 1999) ................................................14

*Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137 (4th
    Cir. 1994) .........................................................................................16

*United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985) ........................... 9

*United States v. Schiff*, 538 F . Supp. 2d 818, 833 (D.N.J. 2008)........................... 8

*Williams v. Rene*, 72 F.3d 1096, 1101-03 (3d Cir. 1995)......................................16

### *Rules*

Fed. R. Evid. 702 .................................................................................. 7

## PRELIMINARY STATEMENT

Defendant/Third-Party Plaintiff 9440 Fairview Avenue, LLC ("9440"), and Defendants Joseph M. Sanzari, Timothy Murray, Joseph M. Sanzari Inc., and North Bergen Asphalt, LLC (hereinafter collectively referred to as "Defendants")  submits this Brief in support of its motion to preclude the expert opinion testimony offered by Plaintiff AMA Realty, LLC's ("Plaintiff" or "AMA") of Anthony J. Rinaldi ("Rinaldi") pursuant to Federal Rule of Evidence 702.

AMA has produced an expert report authored by Rinaldi dated February 29, 2016 (hereafter "Rinaldi Report").[1] In the Rinaldi Report (attached to the Certification of Timothy E. Corriston ("Corriston Cert.") as Ex. A), Rinaldi opines that the value of the value of Plaintiff's property located at 9501 Fairview Avenue in North Bergen, New Jersey (the "AMA Property") had been impaired by the actions of 9440. More specifically, Rinaldi opines that the damages are comprised of the stigma associated with the AMA Property, the cost to cure the damages, the deferred utility, and the excess operating expenses. Rinaldi's opinions are wholly subjective and not based upon any methodology, let alone a reliable one. Moreover, Rinaldi's conclusions are not based upon facts on the records.  Further, Rinaldi's opinions are not relevant nor do they assist the trier of fact.

---

[1] AMA served two prior reports from Rinaldi dated December 10, 2014 and February 15, 2016 which have been superseded by the February 2016 Rinaldi report.

1

## STATEMENT OF FACTS

Plaintiff AMA is the owner of property located at 9501 Fairview Avenue in North Bergen, New Jersey (the "AMA Property").  (*See* Plaintiff's First Amended Complaint and Jury Demand (D.E. #31) attached to the Corriston Cert. as Ex. B, at ¶1)

On December 31, 2006, AMA entered into a 10 year lease with Defendant 9440 for the use of the AMA Property which commenced on July 1, 2007 and was scheduled to expire on June 30, 2017 (the "Lease"). (*See* Lease attached to the Corriston Cert. as Ex. C)

On June 29, 2007, Third-Party Defendant, Perfect Body & Fenders Co., Inc. ("Perfect Body"), entered into a Sublease with 9440 for the continued use and occupancy of certain portions of the AMA Property (the "Sublease") which included the entire building structure with the exception of one garage bay. The Sublease was terminated on or about March 31, 2011.  (*See* Sublease attached to the Corriston Cert. as Ex. D)

In or about September 2008, an adjacent property owner and settled Third-Party Defendant, Millennium Resource Recovery, Ltd. ("MRR"), improperly and without proper approvals and permits, undertook changes to the topography of the MRR Property resulting in flooding of the AMA Property during rainstorms. As a result of these changes to the MRR Property, rainwater would flow heavily from the MRR Property onto the AMA Property. (*See* Transcript of Timothy Murray

5097973-1

Deposition dated October 27, 2015, attached to the Corriston Cert. as Ex. E, at T. 86:6-87:10; 91:15-92:15; 95:18-96:8)

In response to the flooding, 9440 admittedly filled portions of the AMA Property with asphalt millings and installed drainage to mitigate the damage being caused by the water from the MRR Property. (*Id.,* at T. 84:18-100:17)

On or about December 15, 2011, 9440 vacated the AMA Property which had been scheduled to terminate on June 30, 2017.

Among the claims asserted by AMA for breach of the Lease are claims relating to millings placed on the AMA Property, a building damage claim, and a claim for future rental payments. (*See,* Ex. B to Corriston Cert.)

9440 does not dispute that it has an obligation to address the issues related to the placement of the asphalt millings on the AMA Property. Indeed, on June 14, 2013, 9440 voluntarily entered into an Administrative Consent Order ("ACO") with the NJDEP to remediate any and all environmental concerns related to its tenancy and restore the AMA Property to its pre-tenancy state. The ACO included an approval from the NJDEP for 9440 to restore the AMA Property to its pre-tenancy elevations, including the removal and disposal of the fill material. 9440 agreed to perform the removal and restoration within 30 days. (*See* NJDEP Administrative Consent Order dated June 14, 2013 attached to the Corriston Cert. as Ex. F).

Thereafter, at the request of AMA, the ACO was suspended and subsequently rescinded on the basis that AMA would be submitting its own restoration plan and

proceeding with the remediation. Because the ACO was suspended and AMA failed to submit a restoration plan, on August 19, 2013, the NJDEP issued a Notice of Violation ("NOV") to AMA and 9440, naming both of those entities as violators. The NOV required that a restoration plan be submitted to the NJDEP within 20 calendar days. (*See* NJDEP Notice of Violation dated August 19, 2013 attached to the Corriston Cert. as Ex. G).

In response to the NOV, 9440 reiterated to the NJDEP that it remained willing to immediately implement all aspects of the ACO and resubmit its restoration plan. (*See* Letter from Tyler & Carmeli, PC to NJDEP dated May 2, 2014, attached to the Corriston Cert. as Ex. H).

AMA's environmental consultant, RTP Environmental Associates, Inc. ("RTP"), by letter dated October 25, 2013, advised the NJDEP that AMA would be submitting its restoration plan within 45 days. (*See* Letter from RTP to NJDEP dated October 25, 2013, attached to the Corriston Cert. as Ex. I).

To date, AMA has failed to submit an approved Restoration Plan or proceed with the restoration. Thus, AMA has not only refused to permit 9440 to proceed, it has also failed to take any meaningful action to remediate and restore the AMA Property including the contamination pre-dating 9440's tenancy for which AMA is solely liable.

## **LEGAL ARGUMENT**

4

## POINT I

## THE OPINIONS SHOULD BE BARRED BECAUSE THEY ARE UNRELIABLE AND NOT BASED UPON SUFFICIENT FACTS OR METHODOLOGY.

Plaintiffs must establish "by a preponderance of proof" that their putative experts' opinions satisfy the requirements of Federal Rule of Evidence 702.  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000) (quoting *Daubert*, 509 U.S. at 593 n.10).   Rule 702 codifies the principles set forth by the Supreme Court in *Daubert* and its progeny, providing that purported expert testimony must satisfy three factors: "(i) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

The Third Circuit has described Rule 702 as embodying a "trilogy of restrictions on expert testimony: qualification, reliability and fit."  *Calhoun v. Yamaha Motor Corp.*, USA, 350 F.3d 316, 321 (3d Cir. 2003) (internal quotations omitted). It is thus the role of the district court to act "as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury."  *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citing *Daubert*, 509 U.S. at 592).

Thus, an "expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'" and "the expert must have 'good grounds' for his or her belief."  In re *Paoli R.R. Yard PCB*

*Litig.* 35 F.3d 717, 742 (3d Cir. 1994) (quoting *Daubert*, 509 U.S. at 590). This Court applies an eight-part test for evaluating the reliability, or scientific validity, of purported expert testimony:

> **Under Daubert, a court must consider, among other factors, [(1)] whether the theory can be tested, [(2)] whether it has been subject to peer review and publication, [(3)] whether it has been generally accepted, and [(4)] the known or potential error rate. Under Third Circuit precedent, a court should also consider four additional factors: (5) the existence and maintenance of standards controlling the technique's operation; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualification s of the expert testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.**

*Marcus v. BMW of N. Am.*, No . 08-5859 (KSH), 2010 WL 4853308, *16 (D.N.J. Nov. 19, 2010) (Hayden, J.) (citations omitted) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) and *In re Paoli*, 35 F.3d at 742), *order vacated on other grounds, Marcus v. BMW of N. Am.*, 687 F.3d 583 (3d Cir. 2012); *see also Calhoun*, 350 F.3d at 321 (same); *United States v. Schiff*, 538 F . Supp. 2d 818, 833 (D.N.J. 2008) (same).

Finally, the expert testimony has to "fit," that is, the court must determine that the opinion "is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)); see also *Comcast Corp. v. Behrend*,

133 S. Ct. 1426, 1435 (2013) (class certification could not properly be based on an expert's damage model that did not fit plaintiffs' theory of liability).

Notably, the failure to identify any methodology is fatal to an expert report. *See*, *e.g.*, *Smith v. Freightliner, LLC*, 239 F.R.D. 390, 392 (D.N.J. 2006) (although expert was qualified, report and testimony lacked methodology and was therefore barred); *Dart v. Kitchens Brothers Manufacturing Co.*, 2007 WL 3283750 (5th Cir. 2007) (purported expert's testimony on timber harvesting contractor's alleged failure to follow best management practices and resulting damages was unreliable, and was thus inadmissible; expert could not establish that his method had ever been used before and did not compare his method with an established one); *Hebbler v. Turner*, 2004 WL 414821, *4 (E.D.La.) (real estate appraiser's expert opinion was inadmissible because she gave "no indication of the method she used to appraise the relevant commercial real estate, other than to say she relied on her knowledge, company listings, and other materials").

## POINT II

### RINALDI'S OPINIONS SHOULD BE BARRED BECAUSE THEY ARE UNRELIABLE AND NOT BASED UPON SUFFICIENT FACTS

AMA intends to call upon Rinaldi to opine that the alleged actions of 9440 of placing asphalt millings on the AMA Property permanently impaired the value of the AMA Property. Under existing law, however, Rinaldi's opinions are inadmissible because they are wholly unreliable and are not relevant to the facts of the case.

7

A.   **Rinaldi's stigma opinion is not based upon a reliable methodology.**

In the Rinaldi Report, Rinaldi opines that due to the placement of the millings on the AMA Property, post remediation, the value of the AMA Property will be permanently impacted by stigma. Rinaldi defines stigma as follows: "Stigma is the incremental loss in value over and above the foregoing costs. It is the market rejection and the additional perceived risk of the contaminated property resulting from the uncertainties and potential liabilities." (*See* Ex. A to Corriston Cert., at p. 48).

Rinaldi provides several general examples of how stigma may manifest itself. (*Id.* at p. 49)   However, in his report, without any analysis, Rinaldi applies a deduction of the value of the property for stigma of 25% or $537,500. Rinaldi explained his application of stigma damages in one sentence in which he makes a conclusory statement without any support or analysis: "The subject property will be impacted by stigma. Given the existence of contaminants and the multiple agencies having jurisdiction, a deduction of 25% is considered appropriate and applied in this matter for stigma." (*See* Ex. A to Corriston Cert., at p. 53).

One of the general factors Rinaldi identified as being considered in establishing and supporting stigma is the uncertainty of additional liabilities.  When questioned as to whether there would be any uncertainty when all of the contaminated material is removed as proposed by AMA in this matter, Rinaldi was unable to specifically respond.  Rather, he simply indicated that up to the period that the material is

8

removed, there is uncertainty.  (*See* Transcript of Anthony J. Rinaldi Deposition dated October 7, 2016 (hereafter "Rinaldi Dep.") at T. 88:21-90:11, attached to the Corriston Cert. as Ex. J)   Thus, Rinaldi readily admits that once the material is removed, there is no stigma which is directly contrary to the opinions he asserts in the Rinaldi Report.

When specifically challenged as to the publications and data upon which he is relying for applying a 25% stigma diminished value, Rinaldi was unable to do so and admitted there is no true support for his unsupported opinion.  Initially, Rinaldi acknowledged that attempting to apply a stigma value is one of the biggest dilemmas an appraiser encounters.   Rinaldi further admitted that the only precise way of measuring stigma is to perform a "paired sale analysis" wherein you pair a property that was sold which was not contaminated versus a property that sold and was contaminated and that he did not perform such an analysis in this matter.

> **Q: Then, in terms of your percentage that you applied, 25 percent, where is that – where -- where is that number coming from? What publications are you relying upon? What of your own data are you relying upon? What is being relied upon?**
>
> **A: That's one of the biggest dilemmas we appraisers have. The – the only conclusive or precise – I shouldn't say "conclusive". Disregard the word "conclusive". The only precise way of measuring that is do what's called a "paired sale analysis," where you pair a property that sold that wasn't contaminated versus – never as versus a property that sold with the – contaminated that was – secured – they don't call it NFA, no further action. It's --**

9

(*Id.* at T. 90:12-91:1).

Rinaldi acknowledged that neither he nor his colleagues compared sale of a complex contaminated property:

> **…I don't know if I don't know if any of my colleagues in Northern New Jersey that have ever come across a paired sale of – of a complex property that made – that was – that ever came across it because the circumstances on which you could measure that is that – is that precise.**

(*Id.* at T. 91:18-23)

Lacking the required data, Rinaldi maintained that he had surveyed people in the past and based upon his experience and those surveys, 20-25% was a "reasonable logical conclusion" of stigma. (*Id.* at T. 91:24-92:17)  Critically, Rinaldi admitted that in fact he had no such survey data, that no survey data was published and his opinion was based upon his own discussions, i.e. informal survey.

> **Q.     All right.  What data do you have that you can provide me?  You mentioned surveys.  Can you provide us with your survey data?**
>
> **A.     No, I don't have formal surveys of that that are published or anything like that.  When I say, "surveys," I am talking about over the years I have talked to people, have talked to brokers.  And I have talked to prospective buyers.  And I have talked to people that have marketed properties.   That type of informal survey.**

(*Id.* at T. 92:18-93:2)

10

When further pressed for data which supported his basis specifically with respect to the northern New Jersey real estate market in which contaminated fill is common to support whether a stigma would be 10, 20, 25, or 30 percent, Rinaldi acknowledged as follows:

> **But there is a lot of articles about stigma and things like that.  But there is nothing published of scientific survey data that gives the precise answer you want, that you are seeking.  And it's – just basically doesn't exist.  The stigma exists, but the precise measure does not exist.  And it's near impossible.  It would be under such an extraordinary set of circumstances of data that you could analyze to – ascertain that.**

*(Id.* at T. 93:17-94:1)

Based upon Rinaldi's own admissions, that even if remediated there would be a loss of value to the property as a result of stigma his opinion is unreliable because: (1) it is not based upon any methodology; (2) it cannot be tested in any way; and (3) he cannot point to any data or authority to support his opinions.  Rinaldi's subjective belief is simply admissible.

**B.      Rinaldi's opinions do not fit and are irrelevant.**

As for the requirement of "fit," the Third Circuit has emphasized that it is "one of relevance and expert evidence which does not relate to an issue in the case is not helpful."  *In re TMI Litigation*, 193 F.3d 613, 670 (3d Cir. 1999). When considering whether the proposed expert testimony "fits" the disputed factual issues in the case, "the requirement of reliability, or 'good grounds,' extends to each step in an expert's

11

analysis all the way through the step that connects the work of the expert to the particular case." *Paoli II*, 35 F.3d at 743. Notably, an expert's bare conclusions that are not based on the facts of the case are not admissible under Rule 702 of the Federal Rules of Evidence. *See Elcock v. Kmart Corp.,* 233 F.3d 734, 756 n. 13 (3d Cir. 2000) (expert who renders opinion based on factual assumptions not present in case does not comply with "fit" requirement).

In deciding whether proffered expert testimony meets *Daubert*'s requirements, a district court's foremost objective must be to rule out subjective belief or unsupported speculation. *Dade v. Diguglielmo*, 283 Fed.Appx. 979, 982 (3d Cir. 2008) (expert testimony lacked a factual foundation, and thus excluded expert's opinion was based on pure speculations). *See also Teska v. Potlach Corp.*, 184 F.Supp.2d 913 (D.Minn. 2002) (Former crane operator had neither the specialized knowledge, nor an adequate factual basis, upon which to render expert opinions on the duties and responsibilities of crane operators what would assist the jury in determining general contractor's vicarious liability for injuries sustained by subcontractor's employee due to improper rigging of crane; former crane operator in forming his opinion did not review any substantive texts, did not view the site of the accident, and did not interview any of the witnesses); *Rogers v. Ford Motor Co.*, 952 F.Supp. 606 (N.D.Ind. 1997).

An expert's opinion should be excluded when it is based on assumptions that are speculative and are not supported by the record. *Curtis v. Besam Group*, 2008

WL 1732956 (D.N.J.) ("in order for an expert opinion to be admissible at trial, the opinion must be based upon factual evidence and not pure speculation, possibilities or contingencies"); *Reeves v. Commonwealth Edison Co.*, 2008 WL 239030, *8 (N.D. Ill.) (expert reports inadmissible in their entirety because they were based upon false assumptions); *Collier v. Varco-Pruden Bldgs., a Div. of United Dominion Industries, Inc.*, 911 F.Supp. 189 (D.S.C. 1995) (expert's opinion should be excluded when it is based on assumptions that are speculative and are not supported by the record). Similarly, expert testimony should be excluded when assumptions made by the expert are not based in fact. *Ortho-McNeil Pharmaceutical, Inc. v. Kali Laboratories, Inc.*, 482 F.Supp.2d 478, 510 (D.N.J. 2007) ("[T]he Third Circuit has demanded that the factual predicate of an expert's opinion must find some support in the record, and has emphasized that mere 'theoretical speculations' lacking a basis in the record will not create a genuine issue of fact. Moreover, where an expert's opinion is predicated on factual assumptions, those assumptions must also find some support in the record." (internal citations omitted)). *See also Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137 (4th Cir. 1994) (expert's testimony should be excluded when assumptions made by expert are not based in fact).

Indeed, general principles of relevance ***require*** exclusion of expert opinion based upon incorrect facts because "evidence based on fictitious facts is just as unreliable as evidence based upon no research at all." *Guillory v. Domtar Industries Inc.*, 95 F.3d 1320, 1329-31 (5th Cir. 1996) (District court did not abuse its discretion

in limiting expert's testimony to discussion of only one of his ten forklift models, and excluding his videotape, in products liability action by employee who was injured when fork fell from forklift; testimony was not based on facts in record but on altered facts and speculation designed to bolster manufacturer's position). *See also Williams v. Rene*, 72 F.3d 1096, 1101-03 (3d Cir. 1995) (reversing admission of expert damages testimony where, despite significant detail, underlying assumption was "unsupported and speculative"); *G-I Holdings v. Hartford Fire Ins. Co.*, 2007 WL 842009 (D.N.J.) (expert opinion is not admissible because it was based largely on speculation and unsupported facts).

### 1. Rinaldi's conclusion that Plaintiff AMA is entitled to stigma damages has no factual basis.

Rinaldi rendered his opinion on stigma damages in this matter despite his acknowledgment it would be rare or surprising to find an industrial property in the lower Bergen/Essex/Hudson County areas which did not have preexisting contamination.  (*See* Ex. J to Corriston Cert., at T. 23:7-24:15)

With respect to the AMA Property, Rinaldi was unaware that contamination had been documented in the soils on the AMA Property prior to the lease or 9440 placing asphalt millings on the AMA Property. Shockingly, Mr. Rinaldi was unaware of the existing contamination because the only materials he reviewed in this matter pertaining to the contamination were reports issued by Plaintiff's environmental experts, RTP and Brinkerhoff Environmental Services, Inc. ("Brinkerhoff") which

14

were provided to him by Plaintiff's counsel. (*See* Ex. J to Corriston Cert., at T. 39:6-21). Rinaldi did not request to see any other environmental information including the reports submitted by Defendant 9440. (*Id.* at T. 39:22-40:2) Critically, Plaintiff's counsel did not provide Rinaldi with the Environmental Waste Management Associates, LLC ("EWMA") 2007 Phase I Environmental Assessment ("Phase I Environmental Assessment") or the Pure Earth Environmental, Inc. ("Pure Earth") 2007 Phase II Environmental Site Investigation ("Phase II Environmental Assessment") which were conducted prior to 9440 occupying the AMA Property.

During Phase I, EWMA identified several potential recognized environmental conditions at the AMA Property which required additional investigation and EWMA recommended that a subsurface soil and groundwater investigation be conducted to determine if there were environmental impacts to the AMA Property. As a result, Pure Earth performed a Phase II Environmental Site Investigation. The Phase II Environmental Assessment confirmed the pre-lease presence of contaminants in the soils and groundwater. Critically, Plaintiff AMA – not 9440 – is required to perform the necessary remediation regarding these contaminants.

Importantly, there is no dispute regarding the pre-lease contamination. Plaintiff's environmental expert and consultant, RTP, acknowledged that there is preexisting, contamination on the AMA Property unrelated to the activities of 9440 and that it was RTP's intention to cap the preexisting contamination utilizing asphalt. (*See* Transcript of John A. Larkins Deposition dated October 20, 2016 (hereafter

"Larkins Dep.") attached to the Corriston Cert. as Ex. K, at T. 37:11-38:17, 41:2-14; 61:4-19; 99:11-100:6). Indeed, Larkins acknowledged that a capping of a preexisting contaminated historic fill is necessary regardless of whether or not there is an issue with the asphalt millings placed on the AMA Property by 9440. (*Id*. at T.100:16-101:17)

Thus, not only did Rinaldi not consider the preexisting contamination on the AMA Property in rendering his stigma opinion, he also failed to consider the fact that all of the asphalt millings imported to the AMA Property by 9440 would be removed and the only preexisting contamination remaining would remain.

Rinaldi was also unaware that there was preexisting groundwater contamination surrounding the AMA Property. As noted in the Court's decision granting Tilcon New York, Inc.'s ("Tilcon") Motion for Summary Judgment, during his deposition, Larkins testified that RTP identified several possible sources of groundwater contamination in the area of the AMA Property including preexisting historical fill located on the AMA Property prior to the commencement of the leasehold in July of 2007, the asphalt millings brought onto the AMA Property by 9440 after July of 2007, the neighboring property and general regional contamination. As a result, RTP did not have sufficient data to establish the cause of the groundwater contamination. (*See* Opinion on Motion for Summary Judgment dated December 28, 2017 (D.E. #219) attached to the Corriston Cert. as Ex. L; Ex. K to Corriston Cert. at T. 67:9-68:19 and 81:3-8) Indeed, Larkins admitted that it is almost impossible to

16

distinguish between groundwater contaminants pre and post the Lease or vis-à-vis regional contamination. (Ex. K to Corriston Cert., at T. 75:21-77:10)

Rinaldi's complete lack of knowledge regarding preexisting historical contaminated fill on the AMA Property for which 9440 bore no responsibility, the preexisting regional groundwater contamination, the inability of Plaintiff's expert, RTP, to establish that groundwater contamination was caused by 9440, and the fact that the imported millings were to be removed while the preexisting soil contamination remained renders any opinion regarding stigma to be factually unsupported. The facts underlying Rinaldi's opinion are clearly erroneous and his opinion is pure speculation and inadmissible. Rinaldi's failure to review documents and testimony which would have provided him with a better understanding of facts of this case are the death knell his report and opinion.

**2.      Rinaldi's conclusion that Plaintiff AMA is entitled to deferred utility damages has no factual basis.**

In the Rinaldi Report, Rinaldi opines that because the remediation would not be completed until May 2022, approximately 6 years from the January 15, 2016 valuation date, and that the AMA Property could not be utilized during this period of time, the deferred utility in this matter is six years. (*See* Ex. A to Corriston Cert., at p.51) Without further analysis, Rinaldi applied a deferred utility deduction of 6.39%. Indeed, in the Rinaldi Report, Rinaldi provides no explanation for the basis of calculation.

17

During his deposition, Rinaldi explained that "deferred utility" means that before you can use a site there is a deferment in the amount of time you can use the site.  More specifically, when he performs a valuation at a point in time, if you are not able to use the site for a few months, it makes a difference in what one would pay for the site.  (*See* Ex. J to Corriston Cert., at T. 78:17-79:13)  It is his opinion that the entire AMA Property – not just the building – is unusable until the building is fixed and the contamination remediated.  (*Id.*)

The entire basis for Rinaldi's opinion is premised upon Rinaldi purportedly being told by RTP that the site cannot be used until RTP issues a clearance via a Remedial Action Outcome ("RAO").  (*Id.* at T. 64:24-67:25)  Rinaldi further stated that although he relied upon information from the engineers that the site could not be used until the RAO was issued, it made sense to him because of the circumstances. (*Id.* at T. 67:11-25)

Rinaldi also opined that because there were claimed violations of the Clean Water Act that "may create a restriction or impediment to utilization of the property." (Ex. A to Corriston Cert., p.19).  During his deposition, Rinaldi explained that the use of the word "may" is based upon an application of logic that is heavy equipment is required it "may" restrict access to the entire site.  (Ex. J to Corriston Cert., at T. 68:1-71:13). Essentially, Rinaldi contended that he was not making an unreasonable "assumption."

18

AMA's environmental consultant/LSRP, Larkins, testified that it would take approximately 24 days to physically remove the asphalt millings from the AMA Property.  (*See* Ex. K to Corriston Cert., at T. 44:12-18)  Larkins further testified that no additional soil investigation was required after July of 2012, that there were no regulatory impediments to RTP proceeding with the soil remediation at that time, and RTP could have proceeded with the remediation, the removal of the millings, provided the property owner authorized RTP to do so.  (*Id*. at T. 59:20-61:3 and 71:21-72:14). Larkins also acknowledged that any remaining groundwater issues as of 2012 could be handled separately and did not impede the ability to utilize the AMA property.  (*Id*. at T. 59:5-19; 66:1-67:8; 71:8-14)  Larkins has not opined in any manner that the remediation activities would prevent the AMA Property from being used due to equipment or other reasons. Further, Larkins explained that the May 22, 2022 deadline upon which Rinaldi relies to support deferred utility damages of 6 years is a regulatory deadline and did not prevent AMA from completing remediation prior thereto.  (*Id*. at T. 82:14-24)

With respect to his opinion upon which Rinaldi relied to state that the property could not be used, Larkins explained that based upon the environmental condition of the property, he "felt" AMA "would not" be able to sell the AMA Property or even lease it until the remediation was complete and removed any potential exposure to individuals operating on the AMA Property.  (*Id*. at T. 52:17-53:3)  However, Larkins

19

readily admitted that he is not an expert in marketability or sale of properties and agreed that contaminated properties are routinely transferred. (*Id.* at T. 53:4-10)

Larkins further explained that the purported hazard to individuals was in dust generated from driving over the property and potentially mold inside the building. (*Id.* at T. 53:11-19)  However, Larkins admitted: that no vapor testing was performed to determine whether there was any hazard; that he was making an assumption; that he has not performed any analysis of any of the dust on the AMA Property or the neighboring property; that no vapor testing or air quality testing was performed; and that he could not opine as to whether the remediation would in any manner prevent the mold from being removed. (*Id.* at T. 53:20-54:13; 98:9-99:2)

### 3.   Rinaldi's cost to cure measurement is not based upon a reliable methodology.

In the Rinaldi Report, Rinaldi applies a cost to cure measurement for purposes of attempting to establish enhanced damages. Essentially, Rinaldi identifies and relies upon the estimates to restore the AMA Property which were provided by Larkins, Glenn Donohue ("Donohue") of Brinkerhoff, and Thomas Parisi ("Parisi") and applies, without explanation or analysis, an additional contingency cost, and concludes that the value of the AMA Property is diminished by the cost to cure the damage to the AMA Property. (Ex. A to Corriston Cert., at p.50-51) Rinaldi's methodology and reliance upon the opinions of Plaintiff's experts is flawed.

With respect to RTP, Rinaldi cites that RTP has estimated that the costs of the removal of the asphalt millings placed on the Property by 9440 are $1,733,000. Rinaldi increases that sum by 15% to $1,992,250 for "contingencies and the purported cost of the removal of the retaining wall and stone wall catch basins, which was not included in the estimate." (*Id*., at p. 50) Not surprisingly, Rinaldi provides no basis for his unsupported opinion as to the cost of the removal of the retaining wall and stone wall catch basins or for a blanket 15% contingency.

Similarly, with respect to the Brinkerhoff estimate, Rinaldi cites that Brinkerhoff provided an estimate for a total cost of $282,000 which Rinaldi has increased by 10% for contingencies for a total of $310,200.  Though Rinaldi claims that the estimate includes the cost for removing fill to the top of the pre-existing grade and then removing approximately 900 cubic yards of fill to the top of the existing grade, in his calculation, he also adds on to the Brinkerhoff estimate, $19,000 representing removing approximately 1,900 cubic yards of fill at a cost of $10 per cubic yard.  Once again, Rinaldi provides no basis for his estimated fill cost which is clearly not within his expertise as an appraiser. (*Id.,* at p. 50)

With respect to Plaintiff's structural damages, Rinaldi cites that the estimate for repairing the building is approximately $1,458,425.  Once again, Rinaldi, on his own, without support from the structural engineer, increases that estimated cost to $1,604,268 (*Id*., at p. 51)

Clearly, Rinaldi has provided no basis to support his contingency methodology nor has he substantiated his expertise in the cost of remediating contaminated properties, addressing wetlands, or repairing the building. Further, Rinaldi's opinions regarding cost to cure do not fit because they are based on incorrect facts of the case. More specifically, as set forth in Defendants' Motion *in Limine* to Preclude the Opinions of John Larkins, Thomas Parisi, and Glenn Donohue, the cost estimates upon which Rinaldi observes themselves are not admissible.

### 4. Rinaldi's excess operating expense submission does not fit and is irrelevant.

Premised upon RTP's estimate of a groundwater monitoring expense of $10,000 every year for 30 years, Rinaldi provides an excess operating expense present value damage of $94,000. However, during his deposition, Larkins acknowledged that if the neighboring Tilcon Property was able to obtain a Classified Exception Area ("CEA") he would conclude that the groundwater contamination detected on the AMA Property is regional and that there would be no requirement for groundwater monitoring. In fact, a CEA for the Tilcon Property was granted and there is no requirement for groundwater monitoring. (*See* Letter from PT Consultants, Inc. to North Bergen Recycling, Inc. dated May 29, 2018 attached to the Corriston Cert. as Ex. M). Once again, the opinions of Larkins in this regard are inadmissible.

### 5. Rinaldi's opinions do not assist the trier of fact and are irrelevant.

5097973-1

In addition to the defects set forth above, Rinaldi's opinions regarding the value of the property, the deferred utility damages and the cost to cure damages do not assist the trier of fact, will cause confusion, and are irrelevant.

Concerning Rinaldi's determination of the value of the AMA Property, absent proof that there will be permanent damage to the AMA Property on an ongoing basis, which is entirely lacking, the opinion is irrelevant. Rinaldi's only attempt to establish a permanent damage was his faulty stigma analysis and methodology. As such, the damages to which Plaintiff AMA is entitled to receive, should it meet its burden, are any damages, if any, directly associated with the breach of Lease such as loss of rent and increased operational expenses during the term of the Lease as well as the cost to remediate the AMA Property to its pre-Lease condition. The present value of the AMA Property has no relevance to these damages. Similarly, the purported cost to cure damages is simply the same as the remediation and repair costs outlined by Plaintiff's other experts. Rinaldi's attempt to lower the value of the AMA Property based upon these costs is confusing, unnecessary, and not relevant. Clearly, to the extent Plaintiff AMA proves its actual damages, Plaintiff AMA will be entitled to a recovery. Rinaldi's analysis is simply an unsupported improper attempt to increase damages based upon "contingencies" beyond his expertise.

There also is no basis for the faulty and unsupported "deferred utility" damage when in this matter should Plaintiff AMA meet its proof burden regarding its claimed

loss of rent.  Clearly, Plaintiff would not be entitled to duplicate damages of loss of rent <u>and</u> deferred utility for being unable to use the Property.

With respect to any claim for deferred utility beyond the scheduled expiration of the Lease, as acknowledged by RTP, there is no basis for deferred utility because, as admitted by Larkins and Donohue, the AMA Property could have been remediated prior to the scheduled expiration of the Lease. (Ex. K to Corriston Cert., at T. 95:22-96:21; Transcript of Glenn Donohue Deposition dated December 22, 2016 attached to the Corriston Cert. as Ex. N, at T. 60:9-62:9).

Accordingly, due to the numerous defects in the opinions expressed by Rinaldi, his opinion in its entirety does not aid the trier of fact and are irrelevant.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendants respectfully request that their motion to preclude the expert opinion testimony offered by Anthony J. Rinaldi be granted.

> CONNELL FOLEY LLP
> Attorneys for Defendant/
> Counterclaimant/Third-Party Plaintiff,
> 9440 Fairview Avenue, LLC, and
> Defendants, Timothy Murray, individually,
> Joseph M. Sanzari Inc., and North Bergen
> Asphalt, LLC
>
>
> By:<u>/s/ *Timothy E. Corriston, Esq.*     </u>
>      Timothy E. Corriston, Esq.
>
> KROVATIN KLINGEMAN LLC

24

Attorneys for Defendant,
Joseph M. Sanzari, individually

Dated: <u>July 15, 2019</u>          By:<u>/s/ *Henry E. Klingeman, Esq.*</u>
                                        Henry E. Klingeman, Esq.
                                        Helen A. Nau, Esq.

25