# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMA REALTY LLC, | CIVIL ACTION NO.: 02:13-cv-00457 (JMV/MF) |
| Plaintiff/Counterclaim Defendant, | |
| v. | |
| 9440 FAIRVIEW AVENUE, LLC, JOSEPH SANZARI, TIMOTHY MURRAY, JOSEPH SANZARI INC., NORTH BERGEN ASPHALT LLC, and TILCON NEW YORK, INC. | |
| Defendant/Counterclaimant/ Third-Party Plaintiff | |
| v. | |
| MILLENNIUM RESOURCES RECOVERY, LTD, PERFECT BODY & FENDERS CO., INC., and JOHN DOES 1-5. | |
| Third-Party Defendants. | |

## DEFENDANT/THIRD PARTY PLAINTIFF 9440 FAIRVIEW AVENUE, LLC AND DEFENDANTS JOSEPH SANZARI, TIMOTHY MURRAY, JOSEPH SANZARI INC. AND NORTH BERGEN ASPHALT, LLC'S

## BRIEF IN SUPPORT OF MOTION *IN LIMINE* TO PRECLUDE THE OPINIONS OF JOHN LARKINS, GLENN DONOHUE AND THOMAS PARISI

Connell Foley LLP
56 Livingston Avenue
Roseland, NJ 07068
973.535.0500
*Attorneys for Defendant/*
*Counterclaimant/Third-Party Plaintiff,*
*9440 Fairview Avenue, LLC, and*
*Defendants, Timothy Murray, individually,*
*Joseph M. Sanzari Inc., and North Bergen*
*Asphalt, LLC,*

Krovatin Klingeman LLC
60 Park Place, Suite 1100
Newark, NJ 07102
973.424.9777
*Attorneys for Defendant,*
*Joseph M. Sanzari, individually*

*Of Counsel and on the Brief*:
     *Timothy E. Corriston, Esq.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS .................................................................................. 3

LEGAL ARGUMENT........................................................................................ 6

POINT I .......................................................................................................... 7

THE OPINIONS SHOULD BE BARRED BECAUSE THEY
ARE UNRELIABLE AND NOT BASED UPON SUFFICIENT
FACTS OR METHODOLOGY.                                                              7

POINT II ......................................................................................................... 9

THE OPINIONS UPON WHICH LARKINS MAY TESTIFY AT
TRIAL SHOULD BE LIMITED TO THE PRESENCE OF
ASPHALT MILLINGS                                                                     9

    A.      The RTP Remedial Cost Summary is not admissible ...................14

POINT III.......................................................................................................15

DONOHUE'S OPINIONS SHOULD BE BARRED BECAUSE
THEY ARE UNRELIABLE AND NOT BASED UPON
SUFFICIENT FACTS                                                                     15

    A.      Brinkerhoff Cost Estimate is not admissible as it is
    unreliable and irrelevant...........................................................17

POINT IV.......................................................................................................18

PARISI'S OPINIONS SHOULD BE BARRED BECAUSE
THEY ARE UNRELIABLE AND NOT BASED UPON
SUFFICIENT FACTS                                                                     18

    A.      Parisi should be barred from issuing legal opinions and
    interpreting contractual documents. ..........................................24

# TABLE OF AUTHORITIES

## *Cases*

*Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d. Cir. 2006) ...................................................................................................25

*Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 321 (3d Cir. 2003) ..................................................................................................... 7

*Dart v. Kitchens Brothers Manufacturing Co.*, 2007 WL 3283750 (5th Cir. 2007) ...................................................................... 6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 n.10 (1993) ................................................................................ 7

*First National State Bank v. Reliance Elec. Co.* 668 F.2d 725, 731 (3d Cir. 1981) .................................................................................25

*Hebbler v. Turner*, 2004 WL 414821, *4 (E.D.La.) ............................................ 6

*Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) ..................................................................... 9

*Krys v. Aaron*, 112 F. Supp. 3d 181, 206 (D.N.J. 2015) ....................................... 9

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)............................ 8

*Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 595 (D.N.J. 2002) ...................................................... 9

*Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 603 n.20 (D.N.J. 2002)................................................ 7

*Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000)................................... 7

*Ross v. Metro. Prop. & Cas. Ins. Co.*, 2008 WL 4793807, *2 (S.D. Miss. Nov. 3, 2008)................................................................14

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) .......................................................................... 8

*Smith v. Freightliner, LLC*, 239 F.R.D. 390, 392 (D.N.J. 2006) ........................... 6

## TABLE OF AUTHORITIES

*St. Charles Condo. Homeowners Assoc'n, Inc. v. Landmark Am. Ins. Co.*, Civil Action No. 1:06cv632 HSO-RHW ......................................15

*United States v. Leo*, 941 F.2d 181, 195-96 (3d Cir. 1991)...................................25

*Yarchak v. Trek Bicycle Corp.*, 208 F. Supp. 2d 470, 496 (D.N.J. 2002)....................................................................................... 9

### Rules

*Fed. R. Evid.* 104(a) ............................................................................ 8

*Fed. R. Evid.* 702 ...........................................................................7, 8

## PRELIMINARY STATEMENT

Defendant/Third-Party Plaintiff 9440 Fairview Avenue, LLC ("9440"), and Defendants Joseph M. Sanzari, Timothy Murray, Joseph M. Sanzari Inc., and North Bergen Asphalt, LLC (hereinafter collectively referred to as "Defendants") submits this Brief in support of its motion to preclude the expert opinion testimony offered by Plaintiff AMA Realty, LLC's ("Plaintiff" or "AMA") of John A. Larkins, LSRP ("Larkins"), Glenn Donohue ("Donohue"), and Thomas R. Parisi, P.E., PC ("Parisi") pursuant to Federal Rule of Evidence 702.

Larkins is an environmental consultant associated with RTP Environmental Associates, Inc. ("RTP") and serves as the Licensed Site Remediation Professional ("LSRP") for the AMA Property. Though AMA has identified Larkins as a testifying expert in this matter, Larkins did not prepare either a disclosure or written report as required by F.R.C.P. 26(a)(2). Rather, Larkins attempts to rely upon opinions purportedly set forth in certain environmental documents prepared by RTP which he and Plaintiff's counsel maintain contain all the opinions he intends to express in this matter at trial.

Notwithstanding the aforesaid, several of the opinions expressed by Larkins are not admissible including Larkins' testimony as to the remedial cost to restore the AMA Property and the source of the groundwater contamination. With respect to the former, Larkins, acknowledged that the RTP cost summary is not based upon

1

actual cost and that additional information is necessary for it to be accurate. Larkins further testified that he was unable to determine the source of the groundwater contamination.

Donohue is associated with Brinkerhoff Environmental Services, Inc. ("Brinkerhoff"). Plaintiff served a report authored by Glenn Donohue entitled "Wetlands Assessment Report of Findings" dated August 17, 2012 ("Brinkerhoff Wetlands Report") for purposes of establishing that 9440 engaged in unlawful and unauthorized wetlands filling of the AMA Property.

9440 seeks to preclude Donohue from testifying based upon his failure to account for critical facts which undermine his opinion entirely. Critically, Donohue admitted that based upon documents presented to him during his deposition, he cannot opine that 9440 engaged in the unauthorized filling of wetlands. As such, the opinions expressed in the report are unreliable, not based upon sufficient facts, not fit, and irrelevant.

Parisi prepared a report purportedly to determine the extent of damages to the buildings and grounds as a result of the tenancy. 9440 seeks to preclude Parisi from testifying based upon his failure to conduct an appropriate investigation and failure to account for critical facts which are entirely inconsistent with his opinion. Indeed, Parisi's opinions are unreliable and not based upon sufficient facts.

2

## STATEMENT OF FACTS

Plaintiff AMA is the owner of property located at 9501 Fairview Avenue in North Bergen, New Jersey (the "AMA Property").  (*See* Plaintiff's First Amended Complaint and Jury Demand (D.E. #31) attached to the Corriston Cert. as Ex. A, at ¶1)

On December 31, 2006, AMA entered into a 10 year lease with Defendant 9440 for the use of the AMA Property which commenced on July 1, 2007 and was scheduled to expire on June 30, 2017 (the "Lease"). (*See* Lease attached to the Corriston Cert. as Ex. B)

On June 29, 2007, Third-Party Defendant, Perfect Body & Fenders Co., Inc. ("Perfect Body"), entered into a Sublease with 9440 for the continued use and occupancy of certain portions of the AMA Property (the "Sublease") which included the entire building structure with the exception of one garage bay. The Sublease was terminated on or about March 31, 2011.  (*See* Sublease attached to the Corriston Cert. as Ex. C)

In or about September 2008, an adjacent property owner and settled Third-Party Defendant, Millennium Resource Recovery, Ltd. ("MRR"), improperly and without proper approvals and permits, undertook changes to the topography of the MRR Property resulting in flooding of the AMA Property during rainstorms. As a result of these changes to the MRR Property, rainwater would flow heavily from

the MRR Property onto the AMA Property. (*See* Transcript of Timothy Murray Deposition dated October 27, 2015, attached to the Corriston Cert. as Ex. D, at T. 86:6-87:10; 91:15-92:15; 95:18-96:8)

In response to the flooding, 9440 admittedly filled portions of the AMA Property with asphalt millings and installed drainage to mitigate the damage being caused by the water from the MRR Property. (*Id.,* at T. 84:18-100:17)

On or about December 15, 2011, 9440 vacated the AMA Property which had been scheduled to terminate on June 30, 2017.

Among the claims asserted by AMA for breach of the Lease are claims relating to millings placed on the AMA Property, a building damage claim, and a claim for future rental payments. (*See,* Ex. A to Corriston Cert.)

9440 does not dispute that it has an obligation to address the issues related to the placement of the asphalt millings on the AMA Property. Indeed, on June 14, 2013, 9440 voluntarily entered into an Administrative Consent Order ("ACO") with the NJDEP to remediate any and all environmental concerns related to its tenancy and restore the AMA Property to its pre-tenancy state. The ACO included an approval from the NJDEP for 9440 to restore the AMA Property to its pre-tenancy elevations, including the removal and disposal of the fill material. 9440 agreed to perform the removal and restoration within 30 days. (*See* NJDEP

Administrative Consent Order dated June 14, 2013 attached to the Corriston Cert. as Ex. E).

Thereafter, at the request of AMA, the ACO was suspended and subsequently rescinded on the basis that AMA would be submitting its own restoration plan and proceeding with the remediation. Because the ACO was suspended and AMA failed to submit a restoration plan, on August 19, 2013, the NJDEP issued a Notice of Violation ("NOV") to AMA and 9440, naming both of those entities as violators. The NOV required that a restoration plan be submitted to the NJDEP within 20 calendar days. (*See* NJDEP Notice of Violation dated August 19, 2013 attached to the Corriston Cert. as Ex. F).

In response to the NOV, 9440 reiterated to the NJDEP that it remained willing to immediately implement all aspects of the ACO and resubmit its restoration plan. (*See* Letter from Tyler & Carmeli, PC to NJDEP dated May 2, 2014, attached to the Corriston Cert. as Ex. G).

AMA's environmental consultant, RTP, by letter dated October 25, 2013, advised the NJDEP that AMA would be submitting its restoration plan within 45 days. (*See* Letter from RTP to NJDEP dated October 25, 2013, attached to the Corriston Cert. as Ex. H).

To date, AMA has failed to submit an approved Restoration Plan or proceed with the restoration. Thus, AMA has not only refused to permit 9440 to proceed, it

has also failed to take any meaningful action to remediate and restore the AMA Property including the contamination pre-dating 9440's tenancy for which AMA is solely liable.

Notably, the failure to identify any methodology is fatal to an expert report. *See*, *e.g.*, *Smith v. Freightliner, LLC*, 239 F.R.D. 390, 392 (D.N.J. 2006) (although expert was qualified, report and testimony lacked methodology and was therefore barred); *Dart v. Kitchens Brothers Manufacturing Co.*, 2007 WL 3283750 (5th Cir. 2007) (purported expert's testimony on timber harvesting contractor's alleged failure to follow best management practices and resulting damages was unreliable, and was thus inadmissible; expert could not establish that his method had ever been used before and did not compare his method with an established one); *Hebbler v. Turner*, 2004 WL 414821, *4 (E.D.La.) (real estate appraiser's expert opinion was inadmissible because she gave "no indication of the method she used to appraise the relevant commercial real estate, other than to say she relied on her knowledge, company listings, and other materials").

## LEGAL ARGUMENT

## THE OPINIONS SHOULD BE BARRED BECAUSE THEY ARE UNRELIABLE AND NOT BASED UPON SUFFICIENT FACTS OR METHODOLOGY.

Plaintiff bears the burden of establishing "by a preponderance of proof" that its putative expert's opinions satisfy the requirements of *Fed. R. Evid.* 702. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 n.10 (1993)); *see also Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 603 n.20 (D.N.J. 2002) ("[I]t is Plaintiff's burden, by a preponderance of the evidence, to show that his opinion is reliable and, in turn, that the basic underpinnings of his opinion are reliable."). *Fed. R. Evid.* 702 codifies the principles espoused by the Supreme Court in *Daubert*, providing that an expert must satisfy three factors:  "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Fed. R. Evid.* 702.

Consistent with that Rule, *Daubert* established a "trilogy of restrictions" on the admissibility of expert testimony relating to scientific knowledge. *See Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 321 (3d Cir. 2003).  *Daubert* also applies to expert testimony relating to "technical or other specialized knowledge." *See Oddi*, 234 F.3d at 146 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141

(1999)). This "trilogy" consists of "qualification, reliability and fit." *Id.* It is the role of the district court to act "as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citing *Daubert*, 509 U.S. at 592).

With respect to the reliability, the focus is on the "principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. In making the reliability determination, the Court is guided by the following factors:

> (1) whether a method consists of a testable hypothesis;
> (2) whether the method has been subject to peer review;
> (3) the known or potential rate of error; (4) the existence
> and maintenance of standards controlling the technique's
> operation; (5) whether the method is generally accepted;
> (6) the relationship of the technique to methods which
> have been established to be reliable; (7) the qualifications
> of the expert witness testifying based on the
> methodology; and (8) the non-judicial uses to which the
> method has been put.

*Calhoun*, 350 F.3d at 321. The Court must determine at the outset, pursuant to *Fed. R. Evid.* 104(a), whether the expert is proposing to testify as to some specialized knowledge that will assist the trier of fact in understanding or determining an issue. *Id.* at 592.

As for the third prong, *Fed. R. Evid.* 702 requires that the "proffered expert testimony must 'fit' within the facts of the case." *Yarchak v. Trek Bicycle Corp.*, 208 F. Supp. 2d 470, 496 (D.N.J. 2002). The fit requirement mandates that the

8

testimony "in fact assist the jury, by providing it with relevant information, necessary for a reasoned decision of the case." *Id.* (citing *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 595 (D.N.J. 2002)). Thus, even if an expert is qualified and relies on sound methodology, he must still "apply this expertise to the matter at hand." *Calhoun*, 350 F.3d at 324.

"[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based on record evidence," because solely narrating the facts is not traceable to a reliable methodology and fails to fulfill *Daubert's* basic requirements. *Krys v. Aaron*, 112 F. Supp. 3d 181, 206 (D.N.J. 2015) (quoting *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005)).

### THE OPINIONS UPON WHICH LARKINS MAY TESTIFY AT TRIAL SHOULD BE LIMITED TO THE PRESENCE OF ASPHALT MILLINGS

Federal Rule of Civil Procedure 26(a)(2) governs the disclosure requirements for expert testimony. In general, a party must disclose the identity of any expert witness it may use at trial, F.R.C.P. 26(a)(2)(A), and must do so "in the sequence the court orders" or "at least 90 days before the date set for trial." F.R.C.P. 26(a)(2)(C). The Rule provides that "unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report –

prepared and signed by the witness – if the witness is one retained or specially employed to provide expert testimony … or one whose duties as the party's employee regularly involve giving expert testimony." F.R.C.P. 26(a)(2)(B).

The requirements of an expert report are as follows:

(i)     A complete statement of all opinions the witness will express and the basis and reasons for them;

(ii)    The facts or data considered by the witness in forming them;

(iii)   Any exhibits that will be used to summarize or support them;

(iv)    The witness's qualifications;

(v)     A list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi)    A statement of the compensation to be paid for the study and testimony in the case.

[F.R.C.P. 26(a)(2)(B).]

Plaintiff AMA has identified Larkins as a testifying expert in this matter. Larkins did not prepare either a disclosure or written report as required by F.R.C.P. 26(a)(2)(B). When confronted with the failure to produce the appropriate disclosure and report at Larkins' deposition, AMA's counsel confirmed that Larkins was a testifying expert. By way of further explanation, Larkins represented that the Executive Summary of the RTP Preliminary Assessment Report (the "2012 PAR"), the conclusions of the Site Investigation/Remedial Investigation Work Plan ("2012 SI/RIWP"), the conclusions of the Remedial Investigation Report ("2013

10

RIR"), and Larkins' January 8, 2016 letter summarizing the investigations he performed on the Property ("Larkins' January 2016 Letter") contains all opinions he intended to express in this matter at trial. (*See* Transcript of John A. Larkins' Deposition dated October 20, 2016 attached to the Corriston Cert. as Ex. I, at T. 11:9-13:4; 2012 PAR attached to the Corriston Cert. as Ex. J; 2012 SI/RIWP attached to the Corriston Cert. as Ex. K; 2013 RIR attached to the Corriston Cert. as Ex. L; Larkins' January 2016 Letter attached to the Corriston Cert. as Ex. M).

Initially, RTP was retained by Plaintiff AMA to perform a preliminary assessment of potential environmental hazards and Areas of Concern (hereafter "AOCs") on the Property. RTP issued the 2012 PAR which contained an executive summary explaining that its purpose was to evaluate the AMA Property for evidence of environmental hazards. The 2012 PAR does not in any way resemble a report or identify an author. Other than an executive summary setting forth general observations that RTP personnel made during a physical inspection of the Property, the document contains no narrative of the information or data collected, nor does it set forth opinions purportedly developed on such data. The remainder of the document consists entirely of charts, exhibits, maps, and what appears to be a completed NJDEP form certified by the Property owner. There is no signature from a representative of RTP, or curriculum vitae of their qualifications and

11

experience. In other words, this document fails in the most basic level to even satisfy the less stringent requirements of Federal Rule 26(a)(2)(C).

Based upon RTP's observations and findings in the 2012 PAR, RTP conducted a site investigation of the AOCs identified at the AMA Property, the results of which are set forth in the 2012 SI/RIWP. The 2013 RIR provides the results of the investigation of the AOCs which require remediation. Critically, none of these reports provide any causation opinion for any of the AOCs, including the cause of the identified contamination or the responsible party.

RTP thereafter issued the 2012 SI/RIWP, a follow-up to the 2012 PAR. Unlike the 2012 PAR, the 2012 SI/RIWP includes a certification identifying Larkins as the LSRP associated with the investigation of the Property. The 2012 SI/RIWP explains that Larkins conducted a site investigation of certain AOCs that were identified, which entailed collecting and analyzing soil samples. The analytical results were attached in the appendix and summarized in the "Conclusion" section of the document.

Following RTP's preliminary assessment and site investigation, RTP issued the 2013 RIR. The 2013 RIR set forth the history of the AMA Property including the fact that Perfect Body operated the body shop that repaired and refurbished buses at the AMA Property from 1982 through March 2011. No causation opinions are expressed.

12

Larkins' January 2016 Letter provides that it was prepared at the request of Mr. Aita to identify environmental/engineering issues at the AMA Property that currently have an impact on the use of the Property.[1] The letter further summarizes the status of the RTP's investigation. It is the only document identified by AMA's counsel and Larkins upon which Plaintiff relies which contains potentially a causation opinion. Under Task 2 – Non-Indigenous Fill Remediation, RTP cites that the NJDEP issued a Notice of Violation that fill material was placed at the subject property by "the tenant" during the term of the Lease between 2007 and 2011. RTP goes on to identify the locations of the fill and finds that the asphalt millings will have to be removed and the site capped. (Ex. M to Corriston Cert.)

In the Larkins' January 2016 Letter, RTP also notes site-wide groundwater contamination and that there may be onsite and offsite impacts. Moreover, RTP also acknowledged that further investigation was necessary. During his deposition Larkins testified that he could not identify the source of the groundwater contamination and in fact Tilcon's motion for summary judgment was granted on the basis of Larkins being unable to opine on this issue. (Ex. I to Corriston Cert., at T. 67:9-68:19 and 81:3-8).

Based on the foregoing, it is clear that any causation opinion by Larkins as against 9440 is limited to the placement of the asphalt millings and the impact on

---

[1] The letter is authored by Donald F. Elias, a principal of RTP –not Larkins.

the AMA Property.  Further, since the origin, cause, and responsible party for the other AOCs has not been established, Larkins should be precluded from testifying regarding those AOCs as it will not aid the trier of fact and will be confusing.

**The RTP Remedial Cost Summary is not admissible**

In conjunction with the Larkins' January 8, 2016 letter, RTP provided a Remedial Cost Summary to address the restoration on the AMA Property. (Ex. M to Corriston Cert., at Table A)

Critically, Larkins admitted during his deposition that the estimate was not based upon actual costs obtained from contractors and that some of the work identified may not be necessary such as the slurry wall and groundwater remediation.  (*See* Ex. I to Corriston Cert., at T. 80:18-82:13; 86:14-87:9)

Larkins also admitted that until RTP completes its investigation, prepares a Remedial Investigation Report, prepares a Remedial Action Workplan and obtains the necessary authorization and conditions for the land use for the permit, it cannot provide an accurate cost for the remediation.  (*Id.,* at T. 103:2-17)  Larkins' admission that the cost estimate upon which Plaintiff AMA relies to establish its damages is not entirely accurate, and Larkins' failure to obtain actual costs from suppliers and contractors, precludes Larkins from providing a cost estimate of damages at trial.  *See*, *e.g.*, *Ross v. Metro. Prop. & Cas. Ins. Co.*, 2008 WL 4793807, *2 (S.D. Miss. Nov. 3, 2008) citing *St. Charles Condo. Homeowners*

14

*Assoc'n, Inc. v. Landmark Am. Ins. Co.*, Civil Action No. 1:06cv632 HSO-RHW (*in limine* motion to exclude plaintiff's construction cost estimate granted because plaintiff's expert's use of data from R.S. Means was not sufficiently specific to facts of case to support testimony).

## POINT I

### DONOHUE'S OPINIONS SHOULD BE BARRED BECAUSE THEY ARE UNRELIABLE AND NOT BASED UPON SUFFICIENT FACTS

Donohue is associated with Brinkerhoff Environmental Services, Inc. Plaintiff served a report authored by Glenn Donohue entitled "Wetlands Assessment Report of Findings" dated August 17, 2012 ("Brinkerhoff Wetlands Report") for purposes of establishing that 9440 engaged in unlawful and unauthorized wetlands filling of the AMA Property. (*See* Brinkerhoff Wetlands Report attached to the Corriston Cert. as Ex. N)

9440 seeks to preclude Donohue from testifying based upon his failure to account for critical facts which undermine his opinion entirely. Critically, Donohue admitted that based upon documents presented to him during his deposition, he cannot opine that 9440 engaged in the unauthorized filling of wetlands. As such, the opinions expressed in the report are unreliable, not based upon sufficient facts, not fit, and irrelevant.

In the Brinkerhoff Wetlands Report, Donohue opined and concluded that 9440 placed unauthorized fill in wetlands on the AMA Property.  (*See* Ex. N to Corriston Cert., at p. 8)

In rendering his opinion, Donohue relied upon various surveys, maps, and aerial and historical photographs of the AMA Property as well as performed an inspection of the site.   (*See* Transcript of Glenn Donohue Deposition dated December 22, 2016 attached to the Corriston Cert. as Ex. O, at T. 10:23-17:20). During his deposition, Donohue was provided with the following documents which he did not have when the Brinkerhoff Wetlands Report was issued:

(a)     NJDEP Waterfront Development Permit issued to AMA;

(b)     Site Plan prepared by Job & Job dated October 17, 1983;

(c)     Permit for the 1985 Tidelands Grant;

(d)     An aerial [photograph] of the Property obtained by EcolSciences dated 1987;

(e)     Topographic survey prepared by Neglia Engineering dated 2007;

(f)     The Administrative Consent Order ("ACO") issued by the NJDEP in 2013.

(*Id*. at T. 37:5-45:20 and T. 49:4-50:7)

After being presented with the aforesaid documents at his deposition, Donohue acknowledged the following critical facts:

16

(a)     Bellman's Creek was not filled-in by 9440 and was filled-in around 1987, prior to 9440's occupancy of the AMA Property.

(b)     He can no longer opine that the area that previously constituted wetlands and purportedly was filled-in by 9440 was not previously filled-in prior to 9440's occupancy of the AMA Property.

(c)     He cannot refute the statement in the ACO issued by the NJDEP that fill material was placed within regulated areas on the site before 2006 and any material from 2006 to 2011 was placed on top of existing fill material which does not constitute an "unauthorized filling of wetlands."

(*Id.* at T. 47:10-50:7).

As such, Donohue should be precluded from testifying in this matter as the opinions expressed in his report are unreliable, not based upon sufficient facts, unfit, and irrelevant.

**A.      Brinkerhoff Cost Estimate is not admissible as it is unreliable and irrelevant.**

In conjunction with the Brinkerhoff Wetlands Report, Gene Santana of Brinkerhoff prepared a Cost Estimate dated October 20, 2014 which was superseded by a Brinkerhoff Cost Estimate dated November 17, 2014 (collectively the "Brinkerhoff Cost Estimate"). (*See* Brinkerhoff Cost Estimate attached to the Corriston Cert. as Ex. P).

17

Initially, since Donohue admitted that he cannot opine that unauthorized filling-in of the wetlands was conducted by 9440, the Brinkerhoff Cost Estimate is entirely irrelevant.   Notwithstanding the aforesaid, Donohue admitted that the "conceptual cost estimate" is not based upon competitive pricing. (*See* Ex. O to Corriston Cert., at T. 51:15-52:4.)   Further, the conceptual cost estimate was prepared in anticipation of preparing a more accurate estimate in conjunction with a Restoration Plan to be submitted to the NJDEP.  (*Id*. at T. 57:10-60:24)

## PARISI'S OPINIONS SHOULD BE BARRED BECAUSE THEY ARE UNRELIABLE AND NOT BASED UPON SUFFICIENT FACTS

Plaintiff AMA has identified Parisi as its engineering expert and served a Building Damage Assessment Report dated October 4, 2012 ("Parisi Report") (*See* Parisi Report attached to the Corriston Cert. as Ex. Q).  The stated purpose of the Parisi Report is to "determine the extent of damages to the building and grounds as a result of recent tenant activities that caused substantial structural damages and altered the site conditions contributing to building damages." (*Id*., at p. 1) However, Parisi makes multiple unsupported conclusions and, as a result, his opinion must be stricken.

Critically, Parisi acknowledges that he has no knowledge of the condition of the building on the AMA Property at the time 9440 entered into the Lease with AMA in July 2007, nor can Parisi state whether the purported conditions for which

18

AMA seeks to hold 9440 responsible occurred during the leasehold or prior thereto as detailed below.

1.      Roof Top Inspection:  Parisi noted that the roof was in poor condition and in need of replacement. He specifically identified rust spots, areas patched with tar to control leaks from rusted and damaged roof covering, gutters which were dislocated and separated away from the main roof panels resulting in side wall leaks to the building and damaged roof leaders.  Parisi also noted there was a dust stone layer from everywhere on the roof "most likely from pollution from site activities from the adjacent recycling site as well as any activities performed at this site when in operation." (*Id.,* at p. 2-3)  In that regard, he noted that it appeared that the roof covering was repeatedly impacted by stone dust, sand particles, etc. that caused premature erosion and deterioration in combination with a lack of maintenance. (*Id.*, at p. 3)

During his deposition, Parisi acknowledged that the only materials he reviewed were those provided to him by Plaintiff AMA. Parisi further acknowledged not reviewing other critical documents, including the Lease between AMA and Perfect Body which pre-dated the 9440 tenancy; photographs taken by Neglia Engineering prior to 9440 entering into the Lease with AMA; the transcripts of AMA's owner, Michael Aita, or the employees of Perfect Body; the original design and site plans; the structural drawings for the building; the

photographic report by Reid Jones McRorie & Williams with photographs dated October 31, 2012, November 1, 2012, November 5, 2012, November 6, 2012 and November 13, 2012 or any documents pertaining to an insurance claim filed by AMA for damage allegedly caused by Superstorm Sandy. (*See* Transcript of Thomas R. Parisi Deposition dated November 8, 2016 attached as Ex. R to the Corriston Cert., at T. 32:21-35:21)

Concerning the conditions described above, Parisi acknowledged as follows:

(i)      The rust spots on the roof were caused by atmospheric changes in the environment such as rain or snow, anything in the environment over its lifetime. He did not observe holes in the roof and other than rust he could not recall how the roof was damaged in any other manner.  (*Id*. at T. 40:18-43:3)

(ii)      Parisi does not know who placed tar on the roof as a temporary repair nor does he know if tar was used on the roof prior to the Lease with 9440.  (*Id*. at T. 43:4-45:9)  Parisi does not know when the gutters were damaged or when the roof leader went missing nor does he know when any damage caused by those conditions first occurred.  (*Id*. at T. 45:23-50:12)

(iii)      Parisi did not perform any forensic testing on the roof to determine the source of the dust nor did he test the dust to determine whether the dust had any impact on the roof panels.  (*Id*. at T. 51:3-21)

20

(iv)   If the eaves of the roof are not properly constructed and the wood ridge is not watertight, it would impact the useful life of the roof and cause moisture to enter the building. Though Parisi went on the roof, he could not state whether the eave was defective or whether the ridge was watertight.  (*Id.* at T. 53:20-55:20)

(v)   Parisi has no photographic information or data in terms of the condition of the roof as of the commencement date of the Lease and does not know the extent of the deterioration cited in his report that had occurred as of the commencement date of the Lease.  (*Id.* at T. 76:19-77-6)

(vi)   Parisi has no knowledge as to when the gutters later came into disrepair.  (*Id.* at T.  91:3-91:22)

2.   Second Floor & First Floor Interior Office, Storage & Partition Work Areas:

Parisi observed that the office showroom and enclosed shop areas were noted to be in poor condition and suffering from moisture damaged ceilings, walls and floors from problematic roof leaks and mold growth.  (*See* Ex. Q to Corriston Cert., at p. 3)

Parisi acknowledged that he did not actually observe a present roof leak which caused that condition and he had no knowledge of the condition of the area as of the date of the commencement of the Lease and did not know if the damage

21

occurred prior to the commencement of the Lease.  (*See* Ex. R to Corriston Cert., at T. 56:25-58:14)

3.    Large Garage Bay Area

Parisi reports observing excess moisture on the interior concrete masonry unit walls which he opines was caused by the gutter failure and roof leaks.  (*See* Ex. Q to Corriston Cert., at p. 3)  As previously stated, Parisi admitted that he did not know whether the gutter failure and roof leaks occurred during the term of the 9440 Lease or prior thereto.

Parisi also observed that Pier C1 was damaged. He further opined that the damage was caused by a vehicle impact and that AMA advised him that it occurred during the 9440 Lease. Parisi concluded that the entire pier needs to be removed and replaced.  (*Id.*, at p. 3-4)

During his deposition, Parisi acknowledged that the mere presence of a crack in the pier does not mean the pier is not salvageable and that to determine whether it needed to be replaced, as opposed to repaired, he would have to perform additional testing.  (*See* Ex. R to Corriston Cert., at T. 58:15-25-62:7 and 64:5-25)

During his inspections, Parisi noted there was dampness in the interior of the building, that groundwater entered the building at specific locations, and that groundwater went under the site of the slab into the interior portions of the large bay area.  However, Parisi also admitted that the significance of the moisture could

22

not be ascertained during his inspection and that though there is a possibility that the slab may have undergone some upheaval, it had not been verified and further examination would be necessary. (*See* Ex. Q to Corriston Cert., at p. 4)   Since Parisi has not conducted further testing nor issued a further opinion on this issue, his observations are not admissible.

4.     Exterior Building Elevation Inspection. In the Parisi Report, Parisi maintains that he noted damages to the building as a result of long-term neglect and lack of maintenance which caused substantial damages to the exterior. Critically, with respect to each of these conditions, Parisi cannot identify when the conditions first occurred and whether they pre or post-dated the Lease.   More specifically, Parisi's testimony as to the cited conditions was as follows:

5.     Cracks in block walls.  Parisi admitted he is unable to determine when the cracks in the block walls occurred, he had no information of whether the cracks existed as of the date of the commencement of the Lease, the cracking could have occurred over time as a result of the manner in which the building was constructed, and that sediment can also cause cracking.  (*See* Ex. R to Corriston Cert., at T. 77:7-78:17)

6.     Sunken slab. Parisi maintains that the site flooding caused by the re-grading of the Property with the asphalt millings resulted in the sinking of one of the rear apron slabs on the north side of the building. (Ex. Q to Corriston Cert., at

p. 5)  During his deposition, Parisi once again stated that his basis for opining that the slab sank, was a gap related to a construction joint which he observed. However, he admitted that he could not state whether the gap and purported sinking occurred before or after the commencement date of the Lease with 9440. (*See* Ex. R to Corriston Cert., at T. 71:8-73:17)  Parisi further admitted that the sinking of the rear apron could have occurred because of poor installation. (*Id*. at T. 73:24-74:2)

7.   Control Joints:  Parisi cited that the control joints were not caulked. However, once again, he could not state when the condition first occurred.  (*Id*. at T. 78:18-80:2)

8.   Mortar joints:   Parisi maintained that he observed deterioration of mortar joints at various locations around the building and that the joints needed to be pointed with new mortar.   Critically, Parisi does not know when the deterioration of the mortar joints first occurred or whether the condition was existing at the time the parties entered into the Lease. (*Id*. at T. 80:3-8)

Given the fact that Parisi was uniformly unable to state when the purported defective conditions occurred and whether they pre or post-dated the Lease, Parisi's opinions are neither fit nor reliable, his testimony should be barred.

**Parisi should be barred from issuing legal opinions and interpreting contractual documents.**

In the Parisi Report, Parisi provides an analysis of the Lease provisions and

24

concludes that 9440 breached the Lease by not maintaining the building, failure to report impact damages to the building, and importing fill to the AMA Property.  As an engineer, Parisi is not qualified to interpret legal provisions or establish that a legal breach occurred.  (*See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d. Cir. 2006) (citing *United States v. Leo*, 941 F.2d 181, 195-96 (3d Cir. 1991)) (holding that under the Federal Rules of Evidence "an expert witness is prohibited from rendering a legal opinion"); *First National State Bank v. Reliance Elec. Co.* 668 F.2d 725, 731 (3d Cir. 1981) (per curiam) (holding that FRE 702 supports excluding expert witnesses from explaining the law to the jury).

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that their motion to preclude the expert opinion testimony offered by John A. Larkins, Glenn Donohue and Thomas R. Parisi be granted.

CONNELL FOLEY LLP
Attorneys for Defendant/
Counterclaimant/Third-Party Plaintiff, 9440
Fairview Avenue, LLC, and Defendants,
Timothy Murray, individually, Joseph M.
Sanzari Inc., and North Bergen Asphalt, LLC

By:/s/ *Timothy E. Corriston, Esq.*
         Timothy E. Corriston, Esq.

Dated: July 15, 2019

KROVATIN KLINGEMAN LLC
Attorneys for Defendant,
Joseph M. Sanzari, individually

By:/s/ *Henry E. Klingeman, Esq.*
         Henry E. Klingeman, Esq.
         Helen A. Nau, Esq.

25